**In re Jacqueline D. and Rocco P. BRUZZESE, Debtors.**

**Bankruptcy No. 897–80807–288(SB).**

United States Bankruptcy Court, E.D. New York.

Nov. 3, 1997.

Brian Novak and Associates by Charles Patterson, Islandia, NY, for Debtors.

Carolyn S. Schwartz, United States Trustee by David Hartheimer, Garden City, NY, Attorney–Advisor.

Wachtell, Lipton, Rosen & Katz by Douglas Mayer, Theodore Mirvis, Alexander Shaknes, New York, NY, for Sears, Roebuck & Co., Inc.

## AMENDED MEMORANDUM AND ORDER ANNULLING REAFFIRMATION AGREEMENT WITH SEARS

STAN BERNSTEIN, Bankruptcy Judge.

### I. Foreground.

On July 31, 1997, this Court issued an order to show cause, *sua sponte*, directing the debtor, Mrs. Bruzzese, and her counsel to appear at a hearing scheduled for August 8, 1997 (Exhibit A). This was one in a series of parallel orders issued at the same time in 30 cases ("thirty cases") following an in-chambers review of all 82 reaffirmation agreements to which Sears, Roebuck & Co. (Sears) was a party and which were filed with the Clerk of the Court between January 1, 1997 and July 21, 1997 in any chapter 7 case assigned to this judge's docket. See Appendix 1 for a preliminary analysis of the 82 cases. In each of the thirty cases, the debtor's counsel had signed a declaration, on the face of the preprinted form of the reaffirmation agreement, that the payments would not impose a hardship on the debtor, and that counsel had fully informed the debtor of the legal effect of the agreement.

Through this sampling of cases, the Court sought to determine whether chapter 7 attorneys were effectively representing their clients, and if not, whether under section 329 of the Bankruptcy Code, their compensation should be reduced. Another way of articulating this judicial concern was to put the chapter 7 consumer debtors' bar on notice that the Court expects attorneys appearing before it to perform at an acceptable level of competency. The apologium for this "policing role" is that to assure a just administration of the Bankruptcy Code. Unfortunately, bankruptcy judges have to anticipate uneasy, and sometimes tense, relationships with the local bar. Were it not, however, for the independence and initiative of many bankruptcy judges across the country in the last two or three years, the widespread abuses in the day to day negotiation and enforcement of reaffirmation agreement would have continued to pass largely unnoticed and unremedied. The resourcefulness of the bankruptcy judges in Boston, in particular, is worthy of emulation. *See In re Iappini,* 192 B.R. 8 (Bankr.D.Mass.1995)(Hon. William C. Hillman); *In re Hovestadt,* 193 B.R. 382 (Bankr.D.Mass.1996)(Hon. Joan N. Feeney); and *In re Latanowich,* 207 B.R. 326 (Bankr.D.Mass.1997)(Hon. Carol J. Kenner). This Court is also aware of similar initiatives oc-

curring at this time in other courts across the country. *See, for example. In re Alfred V. Carlos & Leticia Carlos, Case No. LA 97–31026 SB* (Bankr.C.D.Cal. October 24, 1997)(Hon. Samuel L. Bufford); *In re Danielle L. Viohl, Case No. LA 97–28364–LF* (Bankr.C.D.Cal. September 23, 1997)(Hon. Lisa H. Fenning).

Like *Iappini*, this initial probe into the local reaffirmation practice was precipitated by a concern with the language of Sears' preprinted form. On its face, the form raised a question whether Sears violated applicable New York state consumer protection laws. An order to show cause was initially issued to Sears—see Appendix 2 ("Background"), and then following the initial hearing on the return date, which was continued, the Court issued the 30 parallel orders to show cause directed to the debtor and the debtor's counsel. The Court sought an explanation why the questionable language in the standard form had not been struck or challenged by counsel when negotiating a reaffirmation agreement, and why the debtor's counsel had not negotiated the "standard deal." The focus over several months of short hearings shifted a few degrees from the initial but continuing concern over the questionable language in the preprinted form to the totality of circumstances affecting each reaffirmation agreement. See Appendix 3 ("New York Statutes Initially at Issue").

Fortunately, for Congress and the community of bankruptcy professionals, imaginative and resourceful scholars have begun to publish their preliminary empirical findings describing the real world of reaffirmation agreements. Preliminary results of these exciting and promising studies began to appear in print only after this Court released the prior version of this opinion. See Professors Marianne B. Culhane and Michaela M. White, "Preliminary Results of the Bankruptcy Reaffirmation Project as of September 25, 1997," John D. Schwartz Roundtable, 1997 National Conference of Bankruptcy Judges. See also the recent writing of Professor Karen Gross who raises disturbing issues of statutory construction and broader public policy considerations, "Perceptions and Misperceptions of Reaffirmation Agree-

ments," in Current Developments in Hot and Emerging Areas, 12th Annual Education Program, Commercial law League, presented at the 1997 National Conference of Bankruptcy Judges, and in her fundamental reconceptualization of the entire bankruptcy process in *Failure and Forgiveness* (New Haven, Conn., Yale University Press, 1997).

## II.   The Bruzzese hearing.

The reaffirmation agreement, in this particular case, recited a prepetition claim of $2,300, reduced to and reaffirmed at $1,800, repayable at $43 a month. On the form agreement, the provision respecting the extension of new credit, was neither crossed out, nor filled in.

On August 27, 1997, the Court held an adjourned hearing on its order to show cause of July 31. The Court examined Mrs. Bruzzese under oath and made inquiry of her counsel in his capacity as an officer of the court. Sears renewed its original objection to this proceeding, which it had filed on August 7, 1997, and declined to examine either the debtor or the debtor's counsel. Neither at the initially scheduled nor at the adjourned hearing, nor at any time when this matter remained under submission, did Sears make an oral motion or file a written motion for discovery or request an opportunity to present witnesses or other evidence at a further hearing. Moreover, due to the fact that Sears admitted receiving a copy of the original order to show cause in this particular case on August 5, 1997, and had three weeks within which to prepare for this adjourned hearing or to file any appropriate motions, Sears' renewed objection on August 27—lack of time to prepare for the hearing—is overruled.

Within ten days of this Court's issuing its Memorandum and Order determining this matter on September 11, 1997, Sears filed a notice of appeal to the District Court. In connection with continued evidentiary hearings in companion Lopez cases and following an extended in-chambers conference held on October 6, 1997 with respective counsel for Sears and the United States Trustee, then summarized on the record, Sears made an oral motion for reconsideration or modifica-

tion of the Memorandum and Order issued in this case and in four other companion Lopez cases. On October 14, 1997, Sears submitted its proposed modification and other supplemental documents.

### III. Findings.

Based upon the facts elicited at the hearing, a review of the debtor's reaffirmation agreement with Sears, the declaration of the debtor's counsel on the face of the reaffirmation agreement, the debtor's schedules I and J, further hearings in the companion Lopez cases, and the proposed modification to the prior Memorandum and Order in this case and in four other companion Lopez cases, the Court restates, as amended, the following findings of fact:

1. When Mrs. Bruzzese entered into the reaffirmation agreement with Sears, she and her husband, suffered a negative monthly cash flow of $759—as evidenced by schedules I and J; yet she obligated herself to pay Sears $43 a month on a reaffirmed indebtedness of $1,800, commencing on April 7, 1997.

2. The Court is fully satisfied that the debtors accurately itemized their monthly income and expenses, and finds Mrs. Bruzzese's testimony very credible: she and her husband, hold full-time at jobs outside their home, but they struggle every day just to feed, clothe, and shelter themselves and their three children, ages 6, 12 and 14;

3. In light of this gross insufficiency of net disposable income, making the scheduled payments under the reaffirmation agreement incontrovertibly imposed an undue hardship upon her, her spouse, and their dependents;

4. Counsel admitted that in his legal judgment it was very improbable that Sears would have brought a nondischargeability action against the debtor. Thus, entering into this reaffirmation agreement was not motivated by a debtor's desire to forestall an anticipated nondischargeability action. Indeed, the only reason Mrs. Bruzzese proffered for reaffirming her indebtedness to Sears was to maintain a charge account and to obtain a further extension of credit from that company. There was no legally suffi-

cient reason for the debtor to reaffirm any part of this unsecured indebtedness;

5. Although the form reaffirmation agreement is not filled in with respect to the reinstatement of credit—further evidence of counsel's lack of attention to his client's needs and interests, Mrs. Bruzzese testified that Sears did send her an invoice later showing a $500 increase in her credit line;

6. In this case, the debtor understood by reaffirming $1,800 of her prepetition indebtedness of $2,380.94, she would be extended $500 in new or additional credit. Since the entire prepetition indebtedness would have been discharged, but for her reaffirmation agreement, the true economic cost of this "new credit" of $500 should be deemed to include: (a) the stream of monthly payments on the $1,800 of reaffirmed indebtedness, and (b) the finance charges on $500 in ."new credit." Had the debtor immediately drawn down the $500 in "new credit" and not made any principal reductions on that $500 credit extension for the next twelve months, then she would be obligated to pay: (a) the monthly finance charge on the $500 balance at an actual annual percentage rate of 21%—aggregating $105 for the year, and (b) $43 a month as the scheduled reaffirmation payment—aggregating $516 for the year, for a total of $621.

So for the putative advantage of obtaining and using $500 of new credit, Mrs. Bruzzese would be required to pay $621 for the first year under the terms of her reaffirmation agreement. Assuming the correctness of this approach and computations, then the actual cost of this new credit for the first twelve months carries an actual annual percentage rate of 124.2% [ ($500)(1.242)=$621]. If one were to make an adjustment in determining the "finance charges" to exclude the principal reduction in the reaffirmed amount for the first year of payment, her total "interest payments" would still include $363.92 from the twelve $43 a month in payments, plus the $105 on the "new" credit of $500, for a total of $468.92. This assumes that the $43.00 level monthly payment each is applied first to accrued but unpaid interest on the declining $1,800 balance. Note that in the first month,

the interest on the unpaid balance of $1,800 is $31.50, and the principal reduction is $11.50. So with $621 in aggregate payments, assuming then only $468.92 would be treated as the "finance charge", then the annual percentage rate in year one would be 93.84%.

What Sears did not disclose and what the debtor's attorney did not explain to his client is that, assuming no defaults in the timely payment of the reaffirmed amount, **it would take 76 months to satisfy this amount. Over the 76 months, she would pay a stream of payments totaling $3,269.02, of which the aggregate interest would be $1,469.02.** Query: even if the debtor could afford to service this debt, would she have as a rational decision-maker have agreed to carry this debt for seven years? For a wholly unsecured obligation, this would exceed the maximum payment term of 60 months permitted under a chapter 13 plan by 16 months. Other credit card issuers charge a far lower actual annual percentage rate for a $500 line of credit even to persons who have received a recent discharge in a chapter 7 bankruptcy case;

7. Counsel breached his fiduciary duty to represent his client effectively by his total lack of awareness of or disregard for the true economic costs of this transaction, and his resultant failure to explain these costs and to point out other available sources of consumer credit at a much lower effective rate of interest;

8. By virtue of signing the declaration, counsel also misrepresented to this Court not only that he had fully advised the debtor of the legal and economic effect of entering into the reaffirmation agreement, but also that the debtor's performance under this reaffirmation agreement would not constitute an undue hardship on the debtor; and

9. In light of these facts, the fee charged to the debtors for legal services in this case was excessive. The value of these services with respect to this reaffirmation agreement was negative.

## II. Discussion.

### A. Jurisdiction.

Sears has objected (after this matter was initially determined) that this "Court lacked the authority to reopen a Chapter 7 case on its own motion in order to consider the validity of a reaffirmation agreement filed in such case, after an order of discharge was entered, the statutory period for rescission of the reaffirmation agreement had expired and the reaffirmation has become a valid and binding agreement."

1. Section 350(b) and Rule 5010.

■ We begin with the general premise: the court has no jurisdiction to reopen a closed case. The language of section 350(b) of the Bankruptcy Code is cast in the passive: "A case may be opened in the court in which such case was closed to administer assets, to accord relief to the debtor, or for other cause." 11 U.S.C. § 350(b). Fed. R.Bankr.P. 5010 improperly restricts the scope of this section by identifying (and perhaps limiting by negative implication) the movant as "the debtor or other party in interest pursuant (sic) to section 350(b) of the Code." It is a cardinal rule of construction that when a Rule impermissibly restricts, is inconsistent with, or contradicts the provisions of the Bankruptcy Code, the Rule is invalid. See *In re Searles,* 70 B.R. 266 (D.R.I.1987) citing *In re Itel Corp.,* 17 B.R. 942 (9th Cir. BAP 1982). In this instance, this Court finds that the Rule is unduly restrictive in excluding by negative implication the sua sponte authority of the Court to reopen cases "to accord relief to the debtor or for other cause." The premise to the orders to show cause in these 30 parallel cases was that the debtor had not been effectively represented, that Sears may have violated applicable state or federal nonbankruptcy law by including certain provisions in its standard preprinted reaffirmation forms, and that the compensation paid to the debtor's counsel was, under the circumstances, excessive and subject to partial or full disgorgement.

It is also sufficient to point to several reported decisions that reject Sears' limiting construction of section 350(b). See *In re Searles,* 70 B.R. at 266; *In re Weathersfield Farms,* 34 B.R. 435 (Bankr.D.Vt.1983); *In re Tall,* 79 B.R. 291 (Bankr.S.D.Ohio). See, especially, *Donaldson v. Bernstein,* 104 F.3d

547, 552 (3d Cir.1997) and the cases cited in this opinion, relying upon section 105(a) to carry out section 350(b): This section "empowered the bankruptcy court to reopen the case on its own motion." See also *In re Doty,* 129 B.R. 571 (Bankr.N.D.Ind.1991); *In re Betts,* 165 B.R. 233 (Bankr.N.D.Ill.1994).

■ Section 105 was specifically amended to clarify and "reconfer," as if it were necessary, the jurisdiction of the court to issue any order "necessary or appropriate to carry out the provisions of [the Bankruptcy Code]. No provision [of the Bankruptcy Code] providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process." In this and the companion Lopez cases, there was at least the appearance that the protective device built into section 524 of the Bankruptcy Code in which debtors' counsel were supposed to protect their clients from entering into improvident reaffirmation agreements, especially of unsecured debts, had "failed of its essential purpose"—to borrow a pregnant phrase from section 2–719(2) of Article 2 of the Uniform Commercial Code overriding contractual limitations on remedies. Since there appeared to be no material change of position of Sears' part, there could be no "equitable limitation" to this court's reopening a case that had been closed by the ministerial action of the Clerk on June 11, 1997—less than two months before this Order to Show Cause was issued on July 31, 1997. This short time interval is hardly laches.

### 2. Declarations by Attorneys.

■ Sears next objects that this Court has no authority to annul a reaffirmation agreement which was accompanied by an attorney's declaration, and was otherwise in compliance with section 524. That begs the dispositive questions: Was the client fully informed? Did the repayment obligation impose an undue hardship on the debtor? Perhaps Sears would have us believe that unless the debtor complains, then the Court has no ground for ordering a hearing on the matter.

To be certain, it was assumed by Congress that bankruptcy judges would be relieved from the time-consuming burden of holding hearings to approve reaffirmation agreements when a debtor is represented. First of all, there is no language precluding a bankruptcy court from scheduling a hearing if a reaffirmation is filed with a declaration. Secondly, as a judge who has an inherent responsibility to see that, in fact, attorneys are doing what they are supposed to, it may be an abdication of duty for a bankruptcy judge to accept all declarations at face value. (Other judges may have an entirely different but wholly legitimate perspective on what their implicit or inherent duties are.) How a court should police reaffirmation practices is unclear. But in this instance, the Court was concerned about the very language in the Sears preprinted form, for it raised at least a question of applicable state or federal nonbankruptcy law. Secondly, a sampling of the debtors' schedules I and J in the 30 cases raised a prima facie concern whether the debtors could meet their repayment obligations under these agreements.

Consumer bankruptcy law is, by its very nature, a "portfolio" business. With 4,500 new cases assigned to this judge's docket each year from the nearly 30,000 cases filed in this district, one should expect specialization in practice in representing consumer chapter 7 debtors. To operate "profitably" in this area, a consumer debtors' lawyer has to do a high volume business. So if a court suspects that a chapter 7 lawyer ineffectively represents a client in one case, that level of poor performance is likely to affect many other clients. The most frustrating aspect of this judicial position is opening case files on a daily basis and discovering clients who are not effectively represented by their lawyers. A bankruptcy court should not adopt an existential posture by wryly or sadly observing: if a chapter 7 debtor suffers from malpractice, then tort remedies are available to that victim. Many chapter 7 debtors, in fact, never discover that their attorneys have committed malpractice. Bankruptcy judges are expected by Congress, the public, the appointing courts of appeals, and the leadership of the bar to maintain high standards of performance by all lawyers appearing before

them. This is "part of the job description." Sometimes the only procedural route available to the court is to issue orders to show cause from time to time to test for potential abuse.

### 3. Annulment.

■ Sears also challenges the authority of the Court to annul a reaffirmation agreement for a debtor represented by counsel once the sixty-day rescission period has passed. (Sears earlier conceded in oral argument that this Court has the authority to disapprove or annul an agreement within the sixty-day rescission period if the agreement does not satisfy the statutory criteria under section 524.) The same reasoning that finds authority for reopening a closed chapter 7 case and vacating an order that otherwise had become final applies a fortiori to annulling a reaffirmation agreement that was not approved by the court before the case was closed. And if an agreement is later found within a reasonable period of its filing (plus 60 days for rescission) to have imposed undue hardship on the debtor or was entered into without adequate information as to its legal and economic consequences—thus, abrogating its voluntary character, then the court has the inherent authority to issue an order to show cause and schedule a hearing why the agreement should not be annulled. Voidable reaffirmation agreements are subject to involuntary rescission.

### 4. Sanctions.

Since the Court has determined not to make any findings of violation by Sears of state law or applicable federal nonbankruptcy law, all of Sears' other jurisdictional or procedural objections are moot.

### IV. Conclusions of Law.

Based upon these findings and discussion, the Court draws the following conclusions of law:

■ A. The debtor's counsel (i) violated the provisions of Federal Rule of Bankruptcy Procedure 9011 by failing to investigate and explain the relevant facts in this case to the debtor, and (ii) by virtue of this negligence, breached his duty of zealous and effective representation of the debtor under the applicable Canons of Professional Responsibility governing all attorneys licensed to practice in the State of New York;

■ B. Counsel's declaration on the face of the reaffirmation agreement must be struck because it violates that attorney's duties under Rule 9011 and the Canons of Professional Responsibility—see *In re Hovestadt*, 193 B.R. 382 (Bankr.D.Mass.1996);

■ C. The reaffirmation agreement must be annulled because (i) it was not in the interest of the debtor to enter into it under the totality of the circumstances of this case, (ii) the debtor was not fully informed about the true economic consequences of this agreement, and (iii) it imposed an undue hardship upon the debtor due to her severely negative monthly cash flow—see 11 U.S.C. § 524(c)(3), (4), and (6), and *In re Hovestadt, supra;*

D. Within thirty days of the effective date of this order, Sears must either return all payments made by the debtor with respect to the reaffirmed debt or apply, at its option, such payments to the reduction of any outstanding balance arising from the debtor's use of her new $500 credit, advise her in writing of its action, and file an affidavit to that effect with the Court; and

E. Within thirty days from the effective date of this order, counsel must repay to the debtors $200 as excessive compensation for the services performed for the debtors in connection with this case, and file an affidavit to that effect with this Court.

### V. Prospective Relief.

Based upon the show cause hearings conducted by this Court, however preliminary and intermittent in character, full disclosure is needed even more in the case of reaffirmation agreements bearing attorneys' declarations when for a number of understandable and some not-so-excusable reasons have failed to explain the true cost of credit arising from these standard form agreements. See Appendix 4 ("Regulation Z").

This Court is in the process of drafting a Chambers Rule in the form of an administra-

tive order that will apply to all reaffirmation agreements filed in cases assigned to this judge's individual docket, whether the debtor is or is not represented by an attorney in negotiating the agreement. It will be distributed for comment to the local county bankruptcy bar, Sears, the United States trustee, and to the relevant committee of the State bar concerned with consumer finance matters. Once that input is received, then it will be forwarded to the Board of Judges for this District for further consideration as a district-wide Local Rule.

■ At present and as an interim administrative order or Chambers Rule, the Court shall require (borrowing from the precedents established by the Hon. Lisa H. Fenning and Hon. Samuel L. Bufford of the Central District of California) the following disclosures to be made, effective January 1, 1998:

A. Unsecured Agreements.

For any reaffirmation agreement of any prepetition debt or extension or addition of new credit arising under an unsecured revolving retail credit account:

1. The creditor shall attach to the reaffirmation agreement or submit to the debtor and to the debtor's counsel in connection with this agreement, an easily legible copy of the underlying credit agreement in at least "10 point type";

2. A full and detailed disclosure statement with respect to:

(a) The amount of the prepetition claim;

(b) The principal amount of the reaffirmed amount;

(c) The minimum monthly payment of the reaffirmed amount;

(d) The actual annual percentage rate of interest and all other types of finance charges and their manner of calculation, including but not limited to any late fees, any over-the-limit fees, any annual or periodic service fee, any optional or mandatory credit insurance premiums, or any other items required, assuming that Regulation Z were to apply to this transaction and treat it as a "refinancing;"

(e) A full and easily legible amortization schedule of the payments so that debtor can understand the number of months that it will take to satisfy the reaffirmed indebtedness, and the amount of credit that would become available under the reopened credit line as the principal balance of that reaffirmed indebtedness was reduced on a monthly basis; and

(f) Separately, as to the extension of new or additional credit, the information required under (d) above for the reaffirmed amount, plus the monthly minimum payment if any of that credit is used; and

4. If the reaffirmation agreement is jointly executed by the parties before the expiration of the deadline for filing complaints under section 523 and to the extent that any part of the "consideration" of "inducement" for the debtor's entering into the reaffirmation agreement is to settle a threatened or potential nondischargeability complaint under section 523(a)(2)(A) or (C), then a detailed summary of the alleged specific transactions and amount that the creditor would seek to except from discharge, and of the alleged legal grounds supporting any potential complaint, as well as a statement describing the right of the debtor to recover costs and reasonable attorney's fees under the limiting conditions of section 523(d); and/or

B. Secured Agreements.

■ For any reaffirmation agreement of any purchase money security interest in consumer goods, to the extent allowed by applicable New York state law, the following disclosures shall have to be made:

1. A easily legible summary of the applicable provisions under the New York Retail Sales Instalment Act;

2. Each of the items set forth under A(1) through (2)(g) above;

3. With respect to each item of merchandise in which the creditor claims a purchase money security interest enforceable as a matter of state law:

(a) A description of each item sufficient to satisfy the requirements of specificity under Article 9 of the Uniform Commercial Code as

adopted by and in effect, as amended, by the State of New York;

(b) The date of purchase of each item;

(c) The invoice amount to the debtor of each item as of the date of purchase, excluding any charges for service contracts or extended warranties;

(d) The outstanding balance as of the petition date for each item;

(e) The estimated retail replacement value of each item of as the petition date, assuming normal wear and tear and customary usage of these items by the debtor, and whatever other adjustments may be required under the circumstances in light of the criteria set forth in the opinion of the U.S. Supreme Court in *Associates Commercial Corp. v. Rash,* —— U.S. ——, 117 S.Ct. 1879, 138 L.Ed.2d 148 (1997), and the basis that the creditor relied upon in making this valuation, including copies of the pages of any relevant industry or intra-company guides;

(f) A summary of the remedies available for enforcement of this agreement under applicable state law; and

(g) A statement of the options available to the debtor as a matter of law under the Bankruptcy Code with respect to one or more items of collateral in either (i) surrendering or abandoning, (ii) redeeming, (iii) retaining and continuing to pay the appropriate indebtedness on a current basis consistent with the opinion of the Second Circuit in *In re Boodrow,* 126 F.3d 43 (2d Cir.1997), or (iv) reaffirming the indebtedness subject to the conditions of section 524.

SO ORDERED.

### EXHIBIT A

UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF NEW YORK

In re:

Jacqueline Bruzzese

Debtor(s)

Case No. 897–80807

Chapter 7

### ORDER TO SHOW CAUSE

Upon reviewing a Reaffirmation Agreement between the Debtor and Sears, Roebuck & Co., Inc. ("Sears"), which includes a declaration signed by counsel for the Debtor;

With respect to the Reaffirmation Agreement, a copy of which is attached, those items which are checked off below appear to be the case;

( ) The entire prepetition indebtedness was reaffirmed;

(X) The prepetition indebtedness was not reduced to $500; In comparable cases, Sears routinely agreed to reduce the prepetition balance to $500 to be paid in modest monthly installments over an extended term;

(X) In comparable cases, Sears routinely reinstates the debtor's credit line; and in this case it did not;

(X) Any references to a security agreement were contrary to the express provisions of the New York Retail Installment Sales Act with respect to any goods purchased before November 6, 1996; therefore several references to a "security agreement" within the text of the preprinted form may have misled the debtor into basing his, her or their decision to reaffirm the indebtedness in the mistaken belief that this was necessary to prevent Sears from repossessing consumer goods purchased from Sears on credit;

(X) Debtor's schedules I and J raise an issue whether the Debtor can afford to repay the reaffirmed indebtedness;

IN THE UNITED STATES BANKRUPTCY COURT
EASTERN FOR THE DISTRICT OF    N.Y.

IN RE: JACQUELINE BRUZZESE                CASE NO. 97 80807 - 238

### REAFFIRMATION AGREEMENT

Whereas, on the date my Petition was filed in the United States Bankruptcy Court in this case I, Jacqueline Bruzzese (Debtor), was indebted to **SEARS, ROEBUCK AND CO.** (Creditor), on account number 03 62115 54528 1, upon which remains an unpaid balance of  $2380.94    for property and services sold by the Creditor.

Debtor wishes to continue to use the SearsCharge Account by reaffirming said debt and security agreement.

Debtor promises, reassumes and agrees to be bound by all of the terms and conditions as set forth in the original security agreement, as amended from time to time, with Creditor including applicable finance charges. Debtor agrees to pay the sum of $1800.00 in payments of# 43.07 per month commencing 4/7/97 and on the same date of each and every succeeding month until said sum is fully paid. Creditor agrees to immediately reinstate a line of credit of       to the account.

THIS AGREEMENT IS NOT REQUIRED UNDER THE BANKRUPTCY CODE, ANY NON-BANKRUPTCY LAW, OR ANY AGREEMENT THAT IS NOT IN ACCORDANCE WITH THE PROVISION OF THE SECTION 524(C). THIS AGREEMENT MAY BE RESCINDED AT ANY TIME PRIOR TO DISCHARGE OR WITHIN SIXTY (60) DAYS AFTER THIS AGREEMENT IS FILED WITH THE COURT, WHICHEVER OCCURS LATER, BY GIVING WRITTEN NOTICE OF RESCISSION TO CREDITOR AT THE FOLLOWING ADDRESS:

Sears   45 Congress Street, Salem, MA 01970

DATED: 3 20/97                    APPROVED:  SEARS

_____           BY: _____
        Debtor(s)                        Bankruptcy Specialist

#### Declaration by Attorney for Debtor

The undersigned hereby declares that I am the Attorney who represented the Debtor during the course of negotiating this Agreement and that this Agreement represents a fully informed and voluntary Agreement by the Debtor and does not impose a hardship on the Debtor or a dependent of the Debtor to the best of my knowledge, information and belief. I have fully advised the Debtor of the legal effect and consequences of this Agreement and the occurrence of default under this Agreement.

_____           _____
        Date                            Debtor's Attorney

#### ORDER APPROVING REAFFIRMATION AGREEMENT
(Only required if the above Debtor(s) are not represented by an Attorney)

The above Reaffirmation Agreement having come before this Court and the requirements of 11 U.S.C. Sec. 524 having been satisfied, BE IT ORDERED that the above Reaffirmation Agreement is hereby approved.

BY THE COURT:

_____           _____
        Date                            Bankruptcy Judge
FORM#4A
(3/96)

Appendix 1: The 82 Sears Reaffirmation Agreements *

The 82 cases showed the following characteristics:

1. In 35 cases, the debtor reaffirmed the entire prepetition claim.

* For assistance in uncovering and analyzing this data, the Court wishes to acknowledge the extraordinary resourcefulness, persistence, and enthusiasm of a remarkable 1997 summer intern, Yoseph Rothstein, Yeshiva University, B.A., 1997; Columbia Law School, Class of 2000.

a. In 17 cases, the claim was less than $500, and the debtor was granted additional credit.

b. In 8 cases, the claim was greater than $500 but less than $1,000, and the debtor was extended additional credit;

c. In 7 cases, the claim exceeded $1,000, and the debtor was extended additional credit;

These claims fell between $1181 and $3644.

d. In 3 cases, the claim exceeded $1,000, but no additional credit was extended.

2. In 47 cases, the debtor reaffirmed less than 100% of the prepetition claim.

a. In 25 cases, the prepetition claim was reduced from an amount greater than $1,000, and reaffirmed at $500, repayable at $15 a month.

For our purposes, we called these the "standard deals."

b. In 3 cases, the prepetition claim was reduced from an amount greater than $1,000, reaffirmed at less than 100% of the claim in an amount greater than $500, and an extension of new credit was extended.

We regarded these as a minor variation of the "standard deal," for the debtor was granted new credit equal to the reaffirmed amount. So if the debtor reaffirmed $900, the debtor was granted additional credit of $900.

c. In 8 cases, the prepetition claim was reduced from an amount greater than $1,000, was reaffirmed at an amount greater than $500, but with no extension of additional credit.

Since the dollar amount was not rounded up to the nearest $500 or $1,000, we assumed as our working hypothesis that the reaffirmed amount was intended to "remedy abusive" purchases made within sixty days of the petition date. In effect, these were settlements of anticipated non-

dischargeability complaints at 100% of the alleged instances of abuse or fraud.

d. In 2 cases, the prepetition claims was reduced from an amount greater than $1,000, but reaffirmed at an amount lower than $500, and without any extension of additional credit.

Since the dollar amount was not rounded up to the nearest $500 or $1,000, we assumed as our working hypothesis that the reaffirmed amount in these 2 cases was also intended to "remedy abusive" purchases of luxury goods made within sixty days of the petition date under section 523(a)(2)(C). These were like the other 8 cases: settlements of anticipated nondischargeability cases at 100% of the alleged instances of fraud or abuse.

At the time of our internal review, there were another 23 cases containing reaffirmation agreements from the same docket, but those were not readily available for review because they were in various stages of processing by the 20 different case administrators in the Clerk's office. Some of those 23 cases may have contained reaffirmation agreements with creditors other than Sears.

We identified the criteria for selecting the 30 cases for the orders of show cause. With respect to the 52 cases left unperturbed, we excluded the following cases for different reasons.

a. 19 cases were for 100% of prepetition claims under $500, with an extension of additional credit of $500. We decided to treat these as raising de minimis concerns with respect to undue hardship on the debtor, although all of these minor amounts were unsecured. The economic cost of a new $500 in credit exceeded the 21% (undisclosed) annual percentage rate, but the "savings" from not having to incur the transaction costs in obtaining new credit from another source was taken in consideration as an offset.

b. 25 cases reflected reductions from more than $1,000 in the prepetition claim to a flat $500, payable at $13 to $15 a month, with an extension of $500 in additional credit. As noted above, we regarded this as the "stan-

dard deal," and the one we took as the norm that should have guided attorneys in negotiating their best deal for their clients. So any time, an attorney approved a 100% reaffirmation of any prepetition claim above $1,000, that flashed a yellow light for us that the attorney may not have effectively represented the debtor.

c. 7 cases reflected reductions of prepetition claims between $800 and $2,000 to a reaffirmed amount of less than $500, but the trade-off was that the debtor was not extended any additional credit. We concluded that those cases did not bear further scrutiny.

d. In 1 case, the prepetition claim was $9,299, and it was reduced to a reaffirmed amount of $1,000, payable at $24 a month. There was no extension of new credit, but this struck us one of the most favorably negotiated deals from the vantage point of the debtor, so we again excluded it from the Order to Show Cause cases.

With this very a priori arithmetic analysis, we were trying to derive the "plays" in Sears' Credit Manual for the reaffirmation game. We had no other readily apparent means for figuring out what was really going on in the hallways outside the meetings of creditors, and whether any further judicial intervention was required for deciding whether Sears was playing fair or foul. During the testimony of Sears' declarant, she explained as best she could the outcomes in each of the 82 cases against Sears' Credit Manual.

### Appendix 2. Background.

To read this opinion is like walking into the theater toward the end of Act II.

Act I opens when Walter & Elizabeth Lopez filed their joint chapter 7 petition pro se. At the conclusion of their attendance at the meeting of creditors, Mrs. Lopez signed a reaffirmation agreement with Sears. Somebody filed it with the general papers of the chapter 7 file with the Clerk of the Bankruptcy Court. Since there are so few pro se reaffirmation agreements other than GMAC, Chrysler Credit, or Ford Motor Credit, the case administrator did not catch it until the file was ready to be closed. At that point,

the Team Supervisor brought this form (and a second reaffirmation agreement with an automobile financier) to the Court's attention. A double hearing was scheduled on notice to the debtor. The debtor failed to appear, and the Court determined that the two reaffirmation agreements should be annulled. But in preparing for what turned out to be a non-hearing, the Court was struck by questionable language on the face of the Sears reaffirmation form. There were repeated references to a "security agreement." The Court had sufficient familiarity with the applicable New York state law to recognize that these references appeared to violate the New York Retail Installment Sales Act on its face. That Act, until November 6, 1996, prohibited a retailer from taking a purchase money security interest in merchandise sold upon a revolving credit line. So the Court issued an order to show cause to Sears in the Lopez case. Sears later admitted that Mrs. Lopez reaffirmed a prepetition claim arising from the purchase of a TV set before November 6, 1996. As a matter of state law, this transaction could not have given rise to a secured transaction. See Appendix 3 below.

Sears retained special counsel to respond. At the initial return hearing held on the June 16, 1997 to the June 4, 1997 order to show cause, Sears' counsel presented and argued its response. From the Court's perspective, Sears seemed to be taking its cue from the Red Queen and the White Rabbit in Alice's Adventures in Wonderland and Through the Looking-Glass. [To uncover most of the little allusions to the various philosophical issues of Lewis Carroll's day, one should read, Peter Heath, The Philosopher's Alice (New York, St. Martin's Press, 1974)]. In its memorandum, Sears sheepishly acknowledged that it had used a "singularly poor choice of words" in its standard form, but the several references to "security agreement" did not mean what they said. In what the Court characterized as Sears' "private language game"—apologies to Ludwig Wittgenstein, Philosophical Investigations and Stanley Cavell, The Claim of Reason—"security agreement" really means "credit agreement," and, therefore, could not be violative of New York state law.

Sears reported at the initial hearing, that it had found 1477 agreements signed by New York debtors from January 1, 1992 though April 30, 1997 from its one-day review of what later was described as drawn randomly from 20 of 38 boxes containing 50,000 reaffirmation agreements administered by its regional collection office in Salem, Massachusetts, which services 10 eastern states: the six New England states, New York, New Jersey, Pennsylvania, and Delaware. If one extrapolated the curves, there would be approximately 2,800 reaffirmation agreements signed by New York debtors during this period. In fact, Sears materially increased its aggressive pursuit of reaffirmation agreements and nondischargeability complaints after January 1, 1995, and so it is highly probable that the number of reaffirmation agreements signed by chapter 7 debtors in New York cases during that period exceeds the annual average of all agreements during the more extended period dating back to January 1, 1992.

This set of 1477 forms included 63 "secured reaffirmation agreements" signed by New York debtors. These forms were entitled "Reaffirmation Agreement–Secured." That is, whenever Sears really intended to claim a security interest in consumer durables purchased by debtors, it would use this standard form. But since all Sears' bankruptcy personnel should have known that New York was an "unsecured state," according to its declarant, these 63 "secured reaffirmation agreements" were the "wrong forms" because purchase money security interests under revolving credit agreements were void as a matter of state law until November 6, 1996. In contrast, the form used in the Lopez case was Sears' standard form of unsecured reaffirmation agreement and the one used in the other 1414 cases. The fact that the Lopez form agreement made repeated references to "security agreement" was irrelevant, so claims Sears, because those references were a "singularly poor choice of words." According to Sears, there were also some other allegedly significant differences in the language of the form letter sent to debtors' counsel soliciting secured reaffirmations, and in the language of "secured" form. Moreover, Sears argued, since the "lien rides through" a bankruptcy case, harking back to *Long v. Bullard*, as reaffirmed by the U.S. Supreme Court in *In re Dewsnup*, it would not need to reaffirm a security agreement. Why then did the standard forms try to accomplish that? "Belt and suspenders," was the forced explanation.

If a national retailer like Sears is to be held to any reasonably objective standard of accountability for the language of its preprinted forms, then these explanations are grossly inadequate and do not excuse Sears for using basic and defined terms of art that are fundamental contrary or inconsistent to the day-to-day application of the Uniform Commercial Code to routine sales and credit transactions with millions of Sears customers. Although to date the Court has yet to be convinced that these slight variations in procedure and language support the points Sears has repeatedly argued, the matter remains under submission.

This report and rationale for relieving Sears from any potential sanctions for violating New York state law was embedded in the first declaration of Sears' Recovery Manger of its Regional Office in Salem, Massachusetts, but Sears did not produce the declarant at the initial hearing on the return date, so the Court declined to admit the declaration into evidence until the declarant was produced for examination. Only when the Court issued an order compelling Sears to produce its declarant for examination and then had an opportunity to have her explain these "singularly poor choice of words" under oath and subject to examination in open court would the evidentiary phase of these proceedings be deemed closed.

To change allusions to children's stories, the more complicated and tortured the explanation from Sears of its intentions with respect to security interests under the form reaffirmation agreements, the more the Court began to wonder whether this was a retelling of Pinocchio—Sears' nose keep getting longer and longer. Sears submitted a supplemental declaration, and finally produced the underlying credit agreement.

Rather than rely upon Sears' potentially biased and unsupervised internal research, this Court then undertook, with the resourceful assistance of a summer intern, to review its own court files, and identify cases meriting further inquiry.

The proceedings from the initial Lopez order to show cause were continued from time to time so that a fuller record could be established. Sears' special counsel was given notice and participated to the extent that it saw fit in all further hearings in the 30 cases, later consolidated for purposes of the reaffirmation agreements with the original Lopez matter. These cases are now referred to as "the companion Lopez cases."

### Appendix 3. The New York Statutes Initially At Issue:

The July 31, 1997 orders to show cause in the 30 cases pointed to the provisions of the New York Retail Installment Act that appeared on its face to apply to the reaffirmation agreement. The New York Retail Instalment Sales Act, N.Y. Pers. Prop. Law § 401 *et seq.* (McKinney 1997) with respect to any purchases on credit made before November 6, 1996, and for any single purchase of less than $200 after November 6, 1996.

Section 413 (12) of the Act provided, in relevant part, before November 6, 1996: No retail instalment credit agreement or any agreement executed in connection therewith, may provide for the creation of a security interest in any personal or real property (including any goods sold under such agreement) to secure a payment of the buyer's outstanding indebtedness under such retail instalment credit agreement. Any such prohibited provision shall be void, but shall not otherwise affect the validity of such retail instalment credit agreement ...

Section 413(12) was amended, in part, to authorize a purchase money security interest in any item of merchandise purchased at a price of not less than $200, effective November 6, 1996.

Section 414 of the Retail Instalment Sales Act (Penalties) provides, in relevant part:

(1) Any person who shall wilfully violate any provision of this article shall be guilty of a misdemeanor and upon conviction shall be punished by a fine not exceeding five hundred dollars.

(2) In case of failure by any person to comply with the provisions of this article, the buyer shall have the right to recover from such person an amount equal to the credit service charge or service charge imposed and the amount of any delinquency, collection, extension, deferral or refinance charge imposed ....

This form of agreement and the surrounding practice also seemed to raise issues under the Consumer Protection from Deceptive Acts and Practices, N.Y. Gen. Bus. Law §§ 349—350(f) (McKinney, 1997). That issue was never fully explored on the record of the hearings, no memorandum was requested of Sears, nor did this Court initiate its own independent research. At best, as far as this statute is concerned, what we engaged in was a preliminary exercise in "spotting the issues." If a Sears' court representative—a nonlawyer—threatened a chapter 7 debtor with a nondischargeability complaint when there was no basis in fact or law for that filing at or immediately after the meeting of creditors, then offered a preprinted and filled-in standard reaffirmation agreement to settle that threatened claim, sweetened it with an offer of an additional $500 in new credit, and did not disclose the true economic costs of that credit; that practice, if established, might have been actionable as a deceptive practice. But given the inherent limitations built into the order to show cause process, and of the reluctance of this Court to expand the disconcerting conflicts of role arising from its sua sponte issuing of the orders to show cause, ordering material witnesses to appear, conducting the examination and re-examination, ruling on Sears' objections to the Court's questions of its employees, then finding the facts, doing one's own research on all questions of law, and then drawing conclusions of law, the Court found it could not within its own resources complete the process far enough to make definitive findings of fact and law on the state law issues. In this case and in the other companion Lopez cases, the Court determined to

rest with its findings in each particular case, and reserve the question of referring these matters to the State Attorney General for further investigation, pending a further analysis of Sears' extension submissions. It should be pointed out that it was not for want of effort by Sears' very responsive counsel and by the Court and its chambers staff that these issues were not resolved.

Appendix 4. Regulation Z.

Finally, Regulation Z, 12 C.F.R. § 226.1 et seq. [1997] under The Truth in Lending Act, 15 U.S.C.A. § 1601 *et seq.* [1997] also appears to apply to these Sears' reaffirmation agreements, but again for the reason mentioned above, the Court specifically declines to make any findings of any violations of this Regulation with respect to the agreements under consideration.

The threshold question is whether there is an exemption from Regulation Z for reaffirmation agreements. To the extent that a reaffirmation agreement is approved by a bankruptcy court after notice and hearing, then presumably that court can, in exercising case management strategies, require sufficient disclosure as a safeguard to an informed consent on the part of the debtor. But when a reaffirmation agreement bears on its the face an attorney declaration that he or she has fully advised the client of the legal effect and consequences of entering into this agreement, the customary practice has been that the form is not reviewed or approved by the court. So if the agreement is not, as a matter of customary practice, subject to court approval, then the protection of judicially mandated disclosure is absent, and there is no "court proceeding" under §§ 226.9(c)(2), and 226.20(a)(3) and in the Official Staff Comment in § 226.2(a)(14)–1. See, generally, Kathleen E. Keest and Gary Klein, Truth in Lending, published by the National Consumer Law Center (Boston, MA, 3rd ed.1995, 1997).

This Court seriously doubts that the Federal Trade Commission intended, if it had a full appreciation of its legal and practical consequences, that the filing of a reaffirmation agreement, especially of unsecured debt that would otherwise be discharged, in hundreds of thousands of cases annually, without any disclosure of all the finance charges at all. Moreover, since in so many instances, Sears ties the extension of new credit to reaffirmation of a prepetition clam, whether this is "a refinancing" under Regulation Z becomes a very disturbing and challenging question which the Commission and its staff has never dealt with adequately in any materials that this Court has found.

It should be noted in fairness to Sears and its counsel that no briefs were solicited on this issue, and the Court relied upon its own unguided preliminary research. But since the Court has decided not to make any findings whether Regulation Z applies, no memorandum was deemed necessary. Without having the FTC participate as amicus, it is difficult for a bankruptcy judge who did not himself or herself litigate Reg. Z and other consumer protection matters when in practice to work through the by now complex, involuted, and perhaps incomprehensible provisions, opinions of administrative law judges, opinions of the Board, official staff comments, and other regulatory materials.

This Court hopes the Federal Trade Commission will pay some much needed attention to revising (and simplifying) Regulation Z at least with respect to reaffirmation agreements under section 524.