In re Ana MELENDEZ, Debtor.

In re Linda S. Spencer, Debtor.

In re Sheila Lafleur, Debtor.

In re Dana P. Callahan, Debtor.

In re Robert J. Belisle, Debtor.

In re Carla M. Crooks, Debtor.

In re Vicki & Robert Joyce, Debtors.

In re Donald & Nancy Wayland, Debtors.

Bankruptcy Nos. 97–45577–HJB, 97–44028–HJB, 97–45570–HJB, 97–45741–HJB, 97–43666–HJB, 97–45–758–HJB, 97–45200–HJB, 97–47509–HJB.

United States Bankruptcy Court, D. Massachusetts.

June 25, 1999.

Kathleen Downing, Worcester, MA, for U.S. Trustee.

David L. Brunelle, Law Offices of David Brunelle, South Hadley, MA, for Ana Melendez and Sheila LaFleur.

Cecilia Calabrese, Law Office of Cecilia Calabrese, Feeding Hills, MA, for Linda Spencer.

Kathleen Patenaude, Shea & Dangora, Billerica, MA, for Dana P. Callahan.

Thomas Wilson, Holyoke, MA, for Robert Belisle and Carla Crooks.

Lisa Van Gordon d'Errico, Northhampton, MA, for Vicki & Robert Joyce.

Stephen Lechter, Attleboro, MA, for Donald & Nancy Wayland.

Mark Polebaum, Hale & Dorr, Boston, MA, for Sears, Roebuck & Co.

## MEMORANDUM OF DECISION

HENRY J. BOROFF, Bankruptcy Judge.

This matter is again before the Court pursuant to its orders to show cause why counsel for each debtor herein did not violate Federal Rule of Bankruptcy Procedure 9011 ("Rule 9011") by signing the "declaration of attorney" which accompanied the respective debtor's reaffirmation agreement with Sears, Roebuck & Co. ("Sears").

### I. *Background*

Each of the foregoing debtors—Ana Melendez ("Melendez"), Linda S. Spenser ("Spenser"), Sheila LaFleur ("LaFleur"), Dana P. Callahan ("Callahan"), Robert J. Belisle ("Belisle"), Carla M. Crooks ("Crooks"), Vicki and Robert Joyce ("Joyce"), and Donald and Nancy Wayland ("Wayland") (collectively the "Debtors")— signed a reaffirmation agreement seeking to reaffirm his or her prepetition debt with Sears, pursuant to 11 U.S.C. § 524(c) of the Bankruptcy Code. Each of those debts arose from one or more purchases made by the Debtor employing a Sears store credit card. Each of the Debtors' statements of income and expenses[1], filed in conjunction with the applicable bankruptcy petition, reflected insufficient postpetition income to meet the respective repayment obligation as set forth in the reaffirmation agreement. However, in each instance, the Debtor's attorney signed a declaration, in accordance with § 524(c)(3), representing to the Court that the Debtor was fully informed as to the legal effect and consequences of the reaffirmation agreement and that the Debtor would not suffer an undue hardship as a result of entering into the reaffirmation agreement. Pursuant to Bankruptcy Rule 9011, this Court was obligated to ask why. *See In re Hovestadt,* 193 B.R. 382, 386 (Bankr.D.Mass.1996). Accordingly, this Court, *sua sponte,* issued orders requiring a representative for both Sears and each Debtor to appear in court and show cause why the respective attorney declarations should not be stricken under Rule 9011 and the reaffirmation agreements disapproved. By issuing those orders, this Court sought to determine whether Debtors' counsel conducted the inquiry required by Rule 9011 before executing their § 524(c)(3) attorney declaration.[2]

In previous show cause hearings with respect to other debtors and Sears, this Court had inquired as to the investigation made by debtor's counsel prior to executing the 524(c)(3) declaration. The Court would ask counsel to describe the nature of the collateral, its value, the amount and terms of the debt to be reaffirmed, whether the goods to be retained were necessaries of the debtor or the debtor's dependents, whether there was a real risk of replevin if the debt was not reaffirmed and the comparison of the replacement value of the subject goods with the amount of the reaffirmed debt. *In re Melendez,* 224 B.R. 252, 261 (Bankr.D.Mass.1998) (hereinafter "*Melendez I* "). "Frequently, debtor's

---

1. Those statements are set forth as Schedules I and J to the bankruptcy petition.

2. In March 1997, this Court began to issue such orders to show cause under Rule 9011 to review the § 524(c)(3) attorney declarations filed in connection with reaffirmation agreements. Not all reaffirmation agreements were subjected to such orders.

Excluded were agreements of debtors whose postpetition income clearly exceeded their postpetition liabilities. In those cases, a determination of undue hardship from the reaffirmance of debt was unlikely, since those debtors enjoyed net disposable income. Also excluded were reaffirmation agreements based on the debtor's residence or automobile, because those were items of indisputable necessity and substantial value regardless of the terms offered by the creditor and because failure of the debtor to reaffirm would likely result in foreclosure or replevin. With respect to the remaining agreements, where the debtor reflected postpetition negative cash flow, all were subjected to scrutiny.

*In re Melendez,* 224 B.R. 252, 263 (Bankr. D.Mass.1998).

counsel could not even identify the collateral, much less opine as to its value. Hardly ever could counsel tell the Court the credit terms on which the reaffirmation was based." *Id.* Unable to sufficiently supply the information sought by the Court, the debtor's counsel instead relayed his or her client's desperate wishes to retain the subject goods and the debtor's fear that the creditor would repossess the property. *Id.*

■■■ As noted in *Melendez I*, "[t]heoretically, counsel's inability to provide the facts underlying the declaration of attorney could (and perhaps should) alone have led to the striking of the § 524(c)(3) attorney declaration and disapproval of the reaffirmation agreement." 224 B.R. at 264. However, the relevant information (e.g., collateral, value, terms, etc.) was always within the knowledge of Sears' attorney. *Id.* Sears' valuation of the subject collateral, the likelihood of replevin, the interest rate on the reaffirmed debt, and the value of and ability to repay any additional line of credit offered to the debtor in excess of the reaffirmed debt, were factors that should have been necessary to the debtor's attorney's determination of whether the reaffirmed obligation would impose an undue hardship on the debtor. *Id.* at 264–266. Accordingly, this Court noted that counsel's ability to make an informed decision about whether to sign a § 524(c)(3) declaration was "inextricably intertwined with the positions and practices" adopted by Sears. *Id.* at 266.

Beginning in October, 1997 and continuing through December, 1997, non-evidentiary show cause hearings were held in the each of the above Debtors' cases. After hearing the parties and examining the Debtors' Schedules, the Court expressed concern that each of the Debtors had executed a reaffirmation agreement which

was not in his or her best interest.[3] In several cases, the Debtors were on public assistance or were otherwise obviously unable to meet their living expenses and/or those of their dependents. The agreements called for payments to be made over 5 to 6 years at an interest rate of 21% per annum. None identified the substantial cost of this refinancing. In every case, the amounts to be paid exceeded the fair value of the asset sought to be retained, and the debtor appeared to have entered into the agreement either out of fear of Sears repossession of a critically necessary asset or on account of a Sears offer of additional credit which the Debtor could not afford to repay.

Each of the foregoing issues raised questions as to the Rule 9011 implications of § 524(c)(3) attorney declarations. Ultimately, this Court determined that it could not make a final determination with respect to the Rule 9011 issues without taking evidence. Consolidation of these eight (8) show cause hearings followed and the matters were scheduled for evidentiary hearing.

The evidence taken at those hearings has been fully documented by this Court in *Melendez I*. The determinations made there are incorporated herein by reference and constitute findings of fact and conclusions of law pursuant to Fed.R.Bankr.P. 7052.[4]

Testimony was taken first from five Sears representatives that had been involved with the reaffirmation agreements of these Debtors. Essentially, the representatives described the documents and other information they regularly received from Sears in advance of § 341 meetings, including form reaffirmation agreements, a listing of the debtors to whom they had been assigned, a listing of the collateral

---

**3.** The details of each Debtor's financial circumstances at the time of his or her execution of the respective reaffirmation agreement is set out fully in *Melendez I*. *See* 224 B.R. at 266–69.

**4.** Fed.R.Bankr.P. 7052 is made applicable to contested matters pursuant to Fed.R.Bankr.P. 9014. Most of the material facts in these cases are uncontested. What the facts import is the real source of dispute.

held by each debtor, and the collateral value as determined by Sears. None had ever received any information as to the debtor's wherewithal to meet the obligations under the reaffirmation agreement, and none believed that it was his or her obligation to determine that reality, or that Sears was eager for such an inquiry. Each claimed never to have threatened repossession of collateral in order to induce the execution of a reaffirmation agreement.[5] *See Melendez I,* 224 B.R. at 271.

At subsequent sessions, each Debtor and each counsel for that Debtor gave testimony.[6] "It is sufficient for these purposes to say that, to a greater or lesser extent, some or all of the debtors were unable to recall receiving critical information which should have been disclosed to them; and that, to a greater or lesser extent, each of the attorneys conceded not obtaining or providing the debtors with that information." *Melendez I,* 224 B.R. at 272. A thorough review of the testimony given by each debtor and his or her respective attorney is detailed below. *See* Part III, infra.

Still later, the Court took testimony from Ms. Debra DeGrenier, the Sears bankruptcy recovery manager responsible for supervising the implementation of Sears reaffirmation and replevin policies in Massachusetts. Ms. DeGrenier testified as to her training and to the procedures of her office, to the training of and procedures employed by the Sears representatives who attend § 341 meetings on Sears' behalf, and on the new replevin policy to be shortly implemented by Sears. *See* March 13, 1998 Hrg.Tr. at 30–110. Sears procedures and replevin policies were deemed critical to the Rule 9011 determinations because "[i]f counsel's rationale for signing the § 524(c)(3) declaration is that

the debtor desires to retain consumer goods because he or she believes them to be necessary, it must follow that counsel is obliged to consider whether the creditor will realistically repossess the goods if they are not surrendered or if a reaffirmation is not agreed to." *Melendez I,* 224 B.R. at 273.

Ms. DeGrenier's testified that—although Sears had now determined not to seek replevy of goods used for medical purposes (such as eyeglasses and hearing aids), infant furniture and used automobile tires and parts—other items likely deemed by debtors as necessaries for their survival such as stoves, refrigerators, and adult and children's furniture were not deemed by Sears as affecting a debtor's or his or her dependent's health and safety. *Melendez I,* 224 B.R. at 273 (citing March 13, 1998 Hrg. Tr. at 60–61, 70–71). Those items were to be deemed by Sears as the proper subject for replevy. *Id.* Sears' intention, she said, was that its new replevin policy be more, rather than less, aggressive than in the past. In fact, the new Sears policy would *not rule out* replevy regardless of the value of the merchandise, and the decision to replevy would be subject to various discretionary factors, including, ironically, the debtor's unwillingness to discuss reaffirmation of the debt with Sears—which Sears described as rudeness to the Sears representative. Further, the new policy would preclude the replevin decision being made until *after* the § 341 meeting. Therefore, at the time of the § 341 meeting, when almost all of the Sears reaffirmation agreements are executed, the Sears representative would be unable to advise a debtor's counsel whether replevin would or would not occur, absent surrender, redemption or reaffirmation. *See Melendez I,* 224 B.R. at 272–73. That policy flatly

---

5. With respect to the last point, the Court found the Sears representatives not credible.

6. The sole exception was Ana Melendez who did not speak the English language well, if at all. The Court was therefore unable to prop-

erly understand Ms. Melendez's testimony, and ultimately found the interpreter who accompanied Ms. Melendez inexperienced and unqualified to properly assist the Court. *See* March 11, 1998 Hrg. Tr. at 60–62.

undermines a recent Consent Judgment between Sears and the Massachusetts Attorney General, pursuant to which Sears promised to disclose any replevin determination which it had already made. *Id.* at 273 n. 31.

The Court also took testimony with respect to Sears' purported update of its valuation tables. This testimony was deemed relevant to this Court's Rule 9011 inquiry "since it [was] Sears' practice to include those valuations in letters sent to debtors or their counsel shortly before the § 341 meeting." *Melendez I,* 224 B.R. at 273. "To the extent that the valuations, characterized in the Sears letter as 'current values,' are relied upon by the debtors or their counsel, without challenge," this Court opined, "the validity of the valuations is interrelated with the propriety of debtor's counsel's reliance thereon in signing the § 524(c)(3) declaration." *Id.* In order to assuage the Court's concerns, Sears had earlier given assurances that it would validate its valuations by retaining the prestigious accounting firm of Deloitte and Touche to update those tables. The testimony at the show cause hearings was intended to test the integrity of those assurances.

During the course of the evidentiary hearings, Sears disclosed that the valuation tables, originally represented to this Court as a Deloitte and Touche product, had only been partially prepared by that firm. And what Deloitte and Touche had prepared was hardly reliable. Instead of valuations, they had prepared depreciation tables using published depreciation curves applied to broad categories of goods. But the goods contained in each category were often unrelated in nature. For example, dehumidifiers, ranges, air conditioners and dishwashers were placed in the same category and assigned the same useful lives and the same rate of depreciation. April 2, 1998 Hrg. Tr. at 61. The condition of the goods, geographical differences in pricing, variations in original purchase price and current market demand for items

within a category were not considered. "Real world" testing for this national valuation table was limited to a small sampling of used goods sold in fourteen stores in Northern New Jersey. Surprisingly, none of the stores visited by Deloitte and Touche was a Sears store nor were any of the stores part of any national chain. And the market data was relevant only to three of the ten Sears categories of inventory for which the valuation tables had been created.

Again, it was for the first time disclosed that the accounting firm had been unable to develop depreciation tables for much of the Sears inventory. To build those tables, some of the categories were subjected to analysis by a Sears employee who had no experience with valuation. He employed valuation techniques and marketing assumptions that were, to say the least, unusual. They are fully described, as best the Court was able to do so, in *Melendez I,* 224 B.R. at 275. It is sufficient for these purposes to note that the Court found those techniques invalid. And even other categories, most notably jewelry and luggage, were developed by even less reliable methodologies. The depreciation table for jewelry was developed from a telephone inquiry from one of Sears' attorneys to another client in the jewelry business. The depreciation table for luggage was based on an inquiry to NorthWest Airlines to determine its payment policy on lost luggage. From this quilt of disjointed and unprofessionally accumulated data were the new valuation tables derived.

Sears did offer the testimony of one Stewart Gold, an attorney flown in from Michigan and an long-time acquaintance of one of the attorneys on the Sears valuation team. Mr. Gold opined as to the diligence required of counsel who execute § 524(c)(3) declarations, and specifically with respect to the declarations before the Court. Based on his review, Mr. Court found that none of the efforts of the Debtors' counsel violated the requirements of Rule 9011. The Court found Mr. Gold's

views unpersuasive and curiously devoid of any real understanding of the professional obligation owed to debtors by their attorneys in the execution of § 524(c)(3) declarations.

At the conclusion of Mr. Gold's testimony, Sears informed the Court that it had completed its presentation of evidence. The United States Trustee indicated his intention to introduce evidence, but, before that evidence could be taken, Sears filed a motion requesting that this Court recuse itself from the ongoing hearings. According to Sears, this Court was personally biased against Sears and was unable to impartially adjudicate the issues at hand. The United States Trustee filed a strong opposition to Sears' motion. The result was *Melendez I,* pursuant to which the recusal motion was denied. No appeal followed.

The United States Trustee subsequently declined the opportunity to present any additional evidence, content to rely on the record before the Court. Nonetheless, Sears and the United States Trustee did file briefs regarding their respective positions, this time on the merits. Following oral argument by counsel to the United States Trustee and Sears, the Court took the issues presented under advisement.

## II. *Positions of the Parties*

### A. Sears

Sears argues that this Court lacks jurisdiction to review the reaffirmation agreements filed in these cases. Sears contends that no "case and controversy" exists. According to Sears, none of the debtors have suffered an actual injury traceable to Sears which may be redressed by a judicial determination. Sears also maintains that this Court does not have jurisdiction under the Bankruptcy Code to review reaffirmation agreements which are accompanied by a § 524(c)(3) attorney declaration.

Sears further contends that the attorney declarations in these cases are in compliance with § 524(c)(3) and Rule 9011. Rule 9011, according to Sears, requires only that attorneys have *some* factual basis for reaching the conclusion that a reaffirmation agreement would not impose an undue hardship on the debtor. Specifically, Sears maintains that a violation of Rule 9011 occurs only "when the attorney has no evidence to support his or her allegations in a pleading filed with the Court." *See* Sears' Mem. of Law at 26. It is Sears' position that, based on the evidence before the Court, each of the attorneys made reasonable inquiry of his or her respective client and had sufficient facts to support the respective § 524(c)(3) certification. Therefore, Sears contends, this Court can not strike any of the attorney declarations.

### B. United States Trustee

The United States Trustee argues that this Court has the jurisdiction to review the reaffirmation agreements in these cases. First, the United States Trustee contends that this Court has the equitable power to ensure compliance with the Bankruptcy Code and specifically § 524(c). The United States Trustee maintains that the Court has the independent authority, notwithstanding the attorney declarations, to ensure that a debtor has not entered into an unwise reaffirmation agreement and that the debtor will not suffer an undue hardship as a result thereof.

Second, the United States Trustee argues that the Rule 9011 determination must take into account all of the circumstances surrounding each attorney's decision to execute the § 524(c)(3) declaration. According to the United States Trustee, the standard under Rule 9011 is not whether the attorney had *some* factual basis for reaching his or her conclusion, but whether based on the *totality of the circumstances* the attorney's conclusion was reasonable. Based on his review of the totality of the circumstances in these cases, the United States Trustee asserts that almost all of the attorney certifications in these cases failed to rise to the level of an objectively reasonable inquiry

under Rule 9011 and therefore should be stricken and the reaffirmation agreements annulled.[7]

### III. *Discussion*

#### A. Section 524(c)

 Generally, in a case under Chapter 7 of the Bankruptcy Code, an individual is discharged from all debts incurred before the filing of the bankruptcy petition. 11 U.S.C. § 727(a). A bankruptcy discharge operates as a permanent injunction against any act to collect, recover, or offset any discharged debt as a personal liability of the debtor. 11 U.S.C. § 524(a). The purpose of this permanent injunction is to effectuate one of the primary goals of the Bankruptcy Code; that is, to afford the honest but unfortunate debtor a financial "fresh start." *Grogan v. Garner*, 498 U.S. 279, 286–87, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). Accordingly, Congress designed and intended the permanent injunction " 'to give complete effect to the discharge,' 'to eliminate any doubt concerning the effect of the discharge as a total prohibition on debt collection efforts,' and 'to insure that once a debt is discharged, the debtor will not be pressured in any way to repay it.' " *In re Latanowich*, 207 B.R. 326, 334 (Bankr.D.Mass. 1997) (quoting S.Rep. No. 989, 95th Cong., 2d Sess. 80–81 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5866; H.R.Rep. No. 595, 95th Cong., 1st Sess. 365–66 (1977)); *see also Walker v. M & M Dodge, Inc. (In re Walker)*, 180 B.R. 834, 840 (Bankr. W.D.La.1995) (the "[d]ischarge is the legal embodiment of the 'fresh start' ").

 Under limited circumstances, section 524(c) of the Bankruptcy Code does permit debtors to reaffirm debts that would otherwise be discharged. *See* 11 U.S.C. § 524(c). Concomitantly, § 524(c) is intended to protect debtors from compromising their fresh start by making un-

wise agreements to repay dischargeable debts. *See Hovestadt*, 193 B.R. at 386 (section 524 should protect debtors from compromising their fresh start by making unwise agreements to repay dischargeable debts ... [and prevent] the danger that creditors may coerce debtors into undesirable reaffirmation agreements.) (quoting *In re Noble*, 182 B.R. 854, 856 (Bankr. W.D.Wash.1995)); *see also Republic Bank of California v. Getzoff (In re Getzoff)*, 180 B.R. 572, 574 (9th Cir. BAP 1995); *Fernandez–Lopez v. Fernandez–Lopez (In re Fernandez–Lopez)*, 37 B.R. 664, 667 n. 1 (9th Cir. BAP 1984); *In re Bowling*, 116 B.R. 659, 664 (Bankr.S.D.Ind.1990). In 1978, Congress recognized that:

> [U]nsuspecting debtors are led into binding reaffirmations [under the Bankruptcy Act], and the beneficial effects of a bankruptcy discharge are undone. The advantages sophisticated and experienced creditors have over unsophisticated debtors in this area ... still remain [despite amendments enacted in 1970]. The unequal bargaining positions of the debtors and creditors, and the creditors' superior experience in bankruptcy matters still lead to reaffirmations too frequently. To the extent that reaffirmations are enforceable, the fresh start goal of the bankruptcy laws is impaired.

H.R.Rep. No. 595, 95th Cong., 1st Sess., at 163 (1978), reprinted in 1978 U.S.C.C.A.N. 5963, 6124. Because reaffirmation by the debtor reduces the scope of the debtor's "fresh start," strict procedures for reaffirming a prepetition debt have been mandated by Congress.

Section 524(c) establishes the requirements for a reaffirmation agreement before it can be approved by the court. It provides in relevant part:

> the United States Trustee, the inquiry by Vicki Joyces' counsel was sufficient to meet Rule 9011 standards.

---

**7.** The United States Trustee has requested that the Court take no further action with respect to the reaffirmation agreement between Vicki Joyce and Sears. According to

(c) An agreement between a holder of a claim and the debtor, the consideration for which, in whole or in part, is based on a debt that is dischargeable in a case under this title is enforceable only to an extent enforceable under applicable nonbankruptcy law, whether or not discharge of such debt is waived, only if—

(1) such agreement was made before the granting of the discharge under section 727, 1141, 1228, or 1328 of this title;

(2)(A) such agreement contains a clear and conspicuous statement which advises the debtor that the agreement may be rescinded at any time prior to discharge or within sixty days after such agreement is filed with the court, whichever occurs later, by giving notice of recision to the holder of such claim; and

(B) such agreement contains a clear and conspicuous statement which advises the debtor that such agreement is not required under this title, under nonbankruptcy law, or under any agreement not in accordance with the provisions of this subsection;

(3) **such agreement has been filed with the court and, if applicable, accompanied by a declaration or an affidavit of the attorney that represented the debtor during the course of negotiating an agreement under this subsection, which states that**

(A) **such agreement represents a fully informed and voluntary agreement by the debtor;**

(B) **such agreement does not impose an undue hardship on the debtor or a dependent of the debtor; and**

(C) **the attorney fully advised the debtor of the legal effect and consequences of—**

(i) **an agreement of the kind specified in this subsection; and**

(ii) **any default under such agreement;**

(4) the debtor has not rescinded such agreement at any time prior to discharge or within sixty days after such agreement is filed with the court, whichever occurs later, by giving notice of the recision to the holder of such claim[.]

11 U.S.C. § 524(c)(1)(2) and (3) (1994) (emphasis supplied).

Each reaffirmation agreement must clearly and conspicuously advise the debtor that execution of the agreement is not required under either bankruptcy or nonbankruptcy law and cannot be required by any other agreement. Each reaffirmation agreement must also be executed before the bankruptcy discharge is granted and must clearly and conspicuously advise the debtor that the agreement may be rescinded any time up to sixty (60) days after it is filed with the court or discharge is granted, whichever is later.

Where the debtor is represented by counsel in the negotiation of the agreement, (as is true for all of the cases now before this Court), the attorney must certify that the agreement "represents a fully informed and voluntary agreement by the debtor," and that the "agreement does not impose an undue hardship on the debtor or a dependent of the debtor." In addition, counsel to the debtor must certify that he or she has fully advised the debtor of the legal effect and consequences of reaffirmation of the debt and any future default by the debtor.

■ Section 524 prohibits reaffirmation of a dischargeable debt without compliance with the procedures set forth in the statute. "These ... requirements exist to prevent debtors from being coerced into signing reaffirmation agreements and to enable them to be fully aware of the consequences of the agreement." *In re Johnson*, 148 B.R. 532, 539 (Bankr.N.D.Ill. 1992). "A reaffirmation agreement which does not comply fully with section 524 is void and unenforceable." *In re Kamps*, 217 B.R. 836, 841 (Bankr.C.D.Cal.1998); *Hovestadt*, 193 B.R. at 386.

## B. Jurisdiction

Sears contends that inasmuch as neither Sears, nor the Debtors, nor their attorneys have objected to the reaffirmation agreements, there is no "live" controversy that can be adjudicated by this Court. Further, Sears argues that because attorney declarations in facial compliance with the statutory requirements of § 524(c) have been filed in each of the cases, this Court has no authority to strike the attorney declarations. As a result, Sears challenges this Court's jurisdiction to make any rulings regarding these agreements or the reaffirmation practices of Sears.

Article III, § 2 of the United States Constitution limits federal court jurisdiction to "cases" and "controversies." Federal courts are thus precluded from issuing opinions on abstract or hypothetical questions. *See Lewis v. Continental Bank Corp.* 494 U.S. 472, 477, 110 S.Ct. 1249, 108 L.Ed.2d 400 (1990); *see also In re Inn on the Bay, Ltd.,* 154 B.R. 364, 367 (Bankr.S.D.Fla.1993) ("[b]ankruptcy courts do not exist for the purpose of solving abstract, academic or hypothetical questions."). In other words, federal courts are prohibited from rendering advisory opinions, that is, opinions which give advice about particular actions, when no party is before the court who has suffered or imminently faces specific injury. *North Carolina v. Rice,* 404 U.S. 244, 246, 92 S.Ct. 402, 30 L.Ed.2d 413 (1971).

It is also undisputed that Bankruptcy Courts have jurisdiction to ensure compliance with the Bankruptcy Code during the administration of a case. *See* 11 U.S.C. § 105. The Court may, *sua sponte,* "tak[e] any action or mak[e] any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process." *Id.* Thus, where a statute establishes certain predicates to an action and those predicates have not been established, a bankruptcy court has the independent authority to ensure compliance with the statutory requirements. *Matter of Spivey,* 230 B.R. 484, 490 (Bankr.E.D.N.Y.1999).

In each of the cases now before the Court, the Debtors' Schedules (signed by the Debtor, but also filed by Debtors' counsel) reflected negative postpetition cash flow. As a result, this Court was properly concerned that the Debtors' counsel had failed to comply with the statutory requirements of § 524(c)(3). *See In re Bruzzese,* 214 B.R. 444, 450 (Bankr. E.D.N.Y.1997) ("In this ... case [where debtor's postpetition expenses exceeded income], there was at least the appearance that the protective device built into section 524 of the Bankruptcy Code in which debtors' counsel were supposed to protect their clients from entering into improvident reaffirmation agreements, ..., had 'failed of its essential purpose[.]' "). To allow reaffirmation agreements in letter compliance with § 524 to be filed and become effective "when close scrutiny compels the conclusion that the elements set forth in section 524(c) are either lacking altogether, insufficient or void," *Hovestadt,* 193 B.R. at 386, has been viewed by at least one court as "an abdication of duty for a bankruptcy judge[.]" *Bruzzese,* 214 B.R. at 450; *see also In re Lindley,* 216 B.R. 811 (Bankr.N.D.Ill.1998); *In re Izzo,* 197 B.R. 11, 12 (Bankr.D.R.I.1996). *But see In re Bauer,* 1997 WL 752652 at *5 (Bankr. E.D.Va. Nov. 12, 1997) (concluding that it would be unwise to and inappropriate to review voluntary reaffirmation agreements when they are accompanied with an attorney declaration); *In re Pendlebury,* 94 B.R. 120 (Bankr.E.D.Tenn.1988) (same).

Further, as was so cogently explained in *Hovestadt* and *Bruzzese,* court review is always appropriate when exercised to monitor the conduct of attorneys who file pleadings with the court. Bankruptcy Rule 9011, which makes provisions of Fed.R.Civ.P. 11 applicable to bankruptcy proceedings, permits a bankruptcy court to impose sanctions against an attorney or other party who files a pleading that is frivolous, legally unreasonable or

without factual foundation, or that is filed in bad faith or for an improper purpose. Fed.R.Bankr.P. 9011. The purpose of Rule 9011 is " 'to control the practice of attorneys, or those who act as their own attorneys, in the conduct of litigation in the federal courts.' " *Melendez I*, 224 B.R. at 258 (quoting *Bus. Guides, Inc. v. Chromatic Communications Enter., Inc.*, 498 U.S. 533, 554, 111 S.Ct. 922, 112 L.Ed.2d 1140 (1991) (Kennedy, J., dissenting)). To that end, subdivision (b) of Rule 9011 provides:

> (b) Representations to the court. By presenting to the court (whether by signing, filing, submitting, or later advocating) a petition, pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, **formed after an inquiry reasonable under the circumstances,—**
>
> > (1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;
> >
> > (2) the claims, defense, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;
> >
> > (3) **the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery;** and
> >
> > (4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on a lack of information or belief.

Fed.R.Bankr.P. 9011(b) (emphasis supplied). Thus, Rule 9011 "explicitly and unambiguously imposes an affirmative duty on each attorney to conduct a reason-

able inquiry into the viability of a pleading before it is signed." *Int'l Shipping Co., S.A. v. Hydra Offshore, Inc.*, 875 F.2d 388, 390 (2d Cir.) (quoting *Eastway Constr. Corp. v. City of New York*, 762 F.2d 243, 253 (2d Cir.1985)), *cert. denied sub nom. Golub v. Hydra Offshore, Inc.*, 493 U.S. 1003, 110 S.Ct. 563, 107 L.Ed.2d 558 (1989). "This requirement assures that lawyers are prepared to demonstrate that they have done the necessary investigation prior to appearing in [or filing pleadings with a] court." *Int'l Shipping*, 875 F.2d at 390.

 A Rule 9011 inquiry, without question, meets a federal court's jurisdictional predicate under Article III, § 2 of the Constitution and also is a proper and effective vehicle for determining whether the requirements of section 524(c)(3) have been satisfied. As explained in *Melendez I*:

> [I]n executing the § 524(c)(3) declaration, counsel to a debtor represents and attests to the court that he or she has conducted "an inquiry reasonable under the circumstances" into whether the obligation imposed by the reaffirmation would impose an undue hardship on the debtor or the debtor's dependents. § 524(c)(3)(B); Fed.R.Bankr.P. 9011(b). Counsel also certifies that there is evidence to support his or her contentions that the agreement "represents a fully informed and voluntary agreement by the debtor," and that he or she fully advised the debtor of the legal effect and consequences of the agreement and a default under the agreement. § 524(c)(3)(A), (C); Fed.R.Bankr.P. 9011(b)(3), (4).

224 B.R. at 258–59; *see also Hovestadt*, 193 B.R. at 386–87 (striking attorney certification under Rule 9011 and voiding reaffirmation agreement where debtor's monthly expenses exceeded her monthly income); *Lindley*, 216 B.R. at 818 (ruling that debtor's attorney violated Rule 9011 by falsely representing in their declaration that they had negotiated a unilateral reaf-

firmation agreement); *Bruzzese,* 214 B.R. at 450–51 (court sua sponte reopened case and annulled reaffirmation agreement, because counsel had failed to inform the debtors, whose monthly expenses exceeded their monthly income, of consequences and had violated Rule 9011 in certifying "no undue hardship").

■■■■ In reviewing § 524(c)(3) declarations "[t]he 'appropriate standard for measuring whether . . . [an] attorney has responsibly initiated and/or litigated a cause of action in compliance with Rule 11 . . . is an objective standard of reasonableness under the circumstances.'" *Sylver v. Sec. Pac. Fin. Servs. (In re Sylver),* 214 B.R. 422, 428 (1st Cir. BAP 1997) (quoting *Cruz v. Savage,* 896 F.2d 626, 631 (1st Cir.1990)). "Subjective good faith is not enough to protect an attorney from sanctions under Rule 11." *Sylver,* 214 B.R. at 428. A court must, therefore, "determine whether the attorney signing the pleading conducted a reasonable inquiry into the facts and law supporting the pleading." *Dorsey & Whitney v. Dakota Rail, Inc. (In re Dakota Rail, Inc.),* 132 B.R. 25, 27–28 (D.Minn.1991) (citing *O'Connell v. Champion Int'l Corp.,* 812 F.2d 393, 395 (8th Cir.1987)).

### D. Testimony of the Debtors and their Attorneys

To assess whether the Debtors' counsel in the cases now before the Court discharged their duties under Rule 9011, each of the Debtors' attorneys were examined under oath and the Court inquired as to what factors and circumstances they considered prior to executing the § 524(c)(3) declarations and what information they provided to their clients. Each of the Debtors were examined to verify what he

or she was told and what factors he or she considered before executing the respective reaffirmation agreement.[8] The following facts were elicited.

#### 1. Ana Melendez[9]

Counsel to Ms. Melendez testified that the Debtor, an Aid to Families with Dependent Children ("AFDC") recipient with a dependent grandchild, reaffirmed her debt to Sears in order to avoid repossession of her refrigerator. Her attorney stated that, at the § 341 meeting, he asked the Sears representative whether Sears would repossess the refrigerator. The representative responded that she could not say one way or the other. According to her counsel, Ms. Melendez felt it would be more difficult to purchase a new refrigerator if Sears repossessed the one she had than to pay Sears under the reaffirmation agreement. Ms. Melendez's fear of repossession and her promise to cut back on her expenses to pay the reaffirmation agreement was deemed by her counsel as sufficient justification for his § 524(c)(3) declaration.[10]

Ms. Melendez's counsel conceded that he did not discuss with the Ms. Melendez the interest rate charged by Sears, how her payments would be apportioned between principal and interest, the amount of time it would take to pay off the debt or the cost of the credit. In addition, Ms. Melendez's counsel failed to independently verify Sears' claimed value of the refrigerator or review the original account agreement.

#### 2. Linda Spencer

Ms. Spencer testified that at her initial meeting with her attorney they discussed Sears' practices of "trying to recuperate a little bit of the loss" by entering into reaf-

---

8. Where, however, a case involved joint debtors, only one was examined.

9. As noted in footnote 6, Ms. Melendez did not testify at the hearing on March 11, 1998. Testimony regarding her decision to enter the reaffirmation agreement was elicited solely from her attorney.

10. Ms. Melendez's Schedules I and J, indicated monthly income of $434 and expenses of $508, resulting in a monthly shortfall of $74, before consideration of amounts due under the reaffirmation agreement.

firmation agreements with debtors. March 5, 1999 Hrg.Tr. at 27. She explained that she entered into a reaffirmation agreement with Sears at her § 341 meeting because she felt "it was just something [she] had to do." *Id.* at 28.[11] Ms. Spencer stated that she and her attorney did not discuss her ability to pay the reaffirmed debt, the applicable interest rate on the reaffirmed debt, how long it would take to pay off the debt, or the possibility that Sears would not reclaim the goods.

Ms. Spencer's counsel testified that her assessment of Ms. Spencer's ability to pay was based on her knowledge that Ms. Spencer's husband was employed and *might* have the income to make the payments to Sears. However, counsel had no idea what Debtor's husband did for a living or whether his income was sufficient to make both the payments to Sears and satisfy the household expenses. Ms. Spencer's counsel further testified that she did not determine the validity or perfection of the Sears security interest or the current value of the subject collateral. In addition, counsel conceded that she did not discuss with her client the possibility that Sears might never attempt to reclaim the items, the interest rate being applied to the debt or how long it would take to pay off the reaffirmed debt at the minimum payment.

### 3. *Sheila LaFleur*

Ms. LaFleur testified that she reaffirmed her debt to Sears because she really needed the items she had purchased, two of them because of medical problems.[12] She explained that she and her attorney believed the values asserted by Sears for the items were high. According to Ms.

LaFleur, her attorney questioned whether she had the ability to pay for the reaffirmed debt and discussed the possibility that Sears might not repossess the goods. However, Ms. LaFleur stated that she did not want Sears to replevy the items, "so rather than take the chance of them repossessing, I signed." *See* March 11, 1998 Hrg.Tr. at 53. Ms. LaFleur testified that she and her attorney did not discuss the interest rate charged by Sears or the amount of time it would take to pay off the reaffirmed obligation to Sears.

Ms. LaFleur's counsel testified that he did not review the original account agreement with the Debtor and Sears, take steps to verify the values asserted by Sears or discuss the cost of credit if only the minimum payments were made. He said that he was concerned that Sears would be more likely to repossess all four of the Debtor's goods, if she only reaffirmed the debt for one of the items. He offered that he would not have signed the § 524(c)(3) declaration if he had known Sears would not repossess the goods. Ms. LaFleur's counsel also testified that he believed that the reaffirmation agreement would not impose an undue hardship upon Ms. LaFleur because her income level would be increasing based on her *expectations* of finding full-time employment after she finished school.

### 4. *Dana P. Callahan*

Mr. Callahan testified that he decided to reaffirm his only two prepetition credit card debts, one with Visa and the other with Sears, in order to maintain his credit and help him obtain a mortgage in the future. Mr. Callahan testified that his at-

---

**11.** Ms. Spencer did not work outside of the home because one of the children under her care had "special needs." The Sears collateral included a washing machine, a microwave, a drill and a lawnmower. Ms. Spencer's Schedule I reflected no monthly income.

**12.** Ms. LaFleur was divorced, supported two minor children, and had total monthly income of $1,232, comprised of Social Security Disability payments, AFDC and food stamps. Her monthly expenses, reported at $1,429, left with her with a $197 monthly deficit. The Sears collateral consisted of a "cardiofit" (purchased in February, 1997), a vacuum cleaner (purchased in October, 1996), a dehumidifier (purchased in October, 1996) and a snowthrower (purchased in December, 1996).

torney never discussed with him the interest rate charged by Sears, the amount of money required to pay the interest obligation on the underlying debt on a monthly basis, or the length of time it would take for Mr. Callahan to pay off the debt to Sears if he made only the minimum payments. He further testified that his attorney did not discuss the type of credit line he was receiving in exchange for reaffirming the entire debt or explain that he was not required to reaffirm the entire debt owed to Sears in order to keep his account open. His attorney informed him that it was unlikely that Sears would replevy the goods purchased.[13]

Counsel to Mr. Callahan testified that she and Mr. Callahan first became aware of Sears' security interest in the subject collateral when Sears sent her a letter, which she forwarded to her client. She maintained that, at the time of the § 524(c)(3) declaration, she believed that reaffirmation of the obligation would not constitute an undue hardship for Mr. Callahan because he was depositing money into a 401(k) account and a savings account. Mr. Callahan's counsel conceded that she did not verify the validity or perfection of Sears' alleged security interest. Nor did she discuss with the Debtor the amount of interest applied to the debt, the amount of money needed to pay the interest obligation on the underlying debt on a monthly basis, the length of time it would take the debtor to pay off the reaffirmed debt, or the type of credit line he was receiving from Sears in exchange for reaffirming the entire debt.

### 5. Robert J. Belisle

Mr. Belisle testified that he planned on reaffirming his obligation to Sears because he wanted to keep his Sears credit card and rebuild his credit. For this reason, he said, he would have signed the reaffirmation agreement even if he had been certain that Sears would not repossess its collateral (a video cassette recorder). According to Mr. Belisle, his attorney questioned him repeatedly about his ability to make the minimum monthly payment, but did not discuss his history of making payments to Sears, the interest rate being charged by Sears, or how long it would take to pay back the debt at the 21% interest rate if he paid only the monthly minimum payments.

Mr. Belisle's attorney testified that he signed the § 524(c)(3) declaration because Mr. Belisle had no dependents and was living with his brother. Mr. Belisle's counsel also maintained that because the remainder of Mr. Belisle's credit card debt was to be discharged, the monthly payment to Sears did not seem to be an undue hardship for Mr. Belisle (although he did say that Mr. Belisle at some point realized he would need to find a better job). When asked why he signed the § 524(c)(3) attorney declaration when the Schedule J expenses (already showing a small monthly shortfall) reflected no projected payments for clothing, medical expenses or health insurance, Mr. Belisle's counsel offered that Mr. Belisle's decision to forego clothing or medical treatment was a lifestyle decision. Mr. Belisle's counsel did mention that he discussed redemption as an option for Mr. Belisle, but that the Mr. Belisle declined in order to keep his Sears' credit card.

### 6. Carla Crooks

Ms. Crooks testified that she and her counsel were approached by a Sears representative at the § 341 meeting. Ms. Crooks asked the representative whether her refrigerator would be repossessed if she did not sign the reaffirmation agreement and was informed by the Sears representative that repossession was possible. Ms. Crooks' counsel confirmed that possibility.

Ms. Crooks and her attorney both informed the Court that Ms. Crooks' attorney had discussed with her the value Sears assigned to the refrigerator (and they

13. The collateral was a table/chest/night stand, purchased in December, 1995.

deemed it appropriate) and the legal effects of reaffirming the debt. Ms. Crook's attorney informed her that she would be liable for the minimum payments, that she would have to pay the debt back with interest, and that she would have her credit line with Sears' reinstated if she paid off the debt and would be able to keep the refrigerator. Ms. Crooks also testified that her attorney told her that she could revoke the agreement during the time prescribed by section 524(c)(3). Ms. Crooks explained that she informed her attorney that she wanted to keep her Sears charge card so that she could buy clothes for her daughter, purchase appliances and charge repairs if she had problems with her car. Nevertheless, Ms. Crooks testified that if she had known that Sears would not take her refrigerator she would not have signed the reaffirmation agreement.

Ms. Crooks' counsel conceded that she did not review the initial account agreement between Ms. Crooks and Sears, go beyond reviewing the receipt for the purchase of the refrigerator to determine whether Sears had a properly perfected security interest, calculate how long it would take Ms. Crooks to pay back her reaffirmed debt if she made only the minimum monthly payment, or discuss with Ms. Crooks the cost of the credit. Ms. Crooks' counsel also stated that she signed the § 524(c)(3) declaration because Ms. Crooks assured her that she could pay back the debt [14] and counsel specifically noted that additional income might be available to Ms. Crooks by garnishing her ex-husband's wages.

### 7. Vicki and Robert Joyce

The Joyces supported four minor children and their Schedules I and J reflected a monthly postpetition shortfall of $362.28. The Sears collateral was a stove. Vicki Joyce testified that her attorney told her that she might be able to retain the stove

without signing the reaffirmation agreement, and discussed with her the interest rate on the reaffirmed debt, and the amount of time it would take to pay off the debt assuming a minimum monthly payment. Ms. Joyce chose to enter into the reaffirmation agreement in order to keep the stove.

Ms. Joyce also testified that her attorney questioned her about her ability to pay the reaffirmed debt. Ms. Joyce informed her attorney that she had returned to her original employment and had also taken on an additional part time job, providing about $1,000 to $1,400 of additional monthly income. In addition, Mr. Joyce, a corrections officer, had also taken an additional part time job, bringing in another weekly $150.

The Joyces' counsel conceded that she did not look at the original account agreement between Sears and the Debtor, but maintained that she did look at the signed slip which Sears had sent to her and verified Ms. Joyce's signature on the slip. As to the value of the stove, counsel asked Ms. Joyce how old the stove was, whether or not it still functioned and whether the stove was still in good condition. In addition, counsel testified that she routinely negotiates with Sears to get the lowest possible value of the item, talks to clients about what a reaffirmation agreement entails, the interest rate, the penalties, the panoply of options available to creditors in the event the debtor defaults, and the fact that the debtor can rescind the agreement within the time provided.

The Joyces' counsel testified that she signed the attorney declaration in this case only after she was sure that the Joyces could afford to pay the reaffirmed debt. She also explained that she and the Ms. Joyce had discussed at length what signing the reaffirmation agreement would entail. Further, counsel stated that she believed that if the debt was not reaffirmed, the potential for replevy was real. She also

---

14. Ms. Crooks testified that she was a single mother supporting one child and, when she completed her Schedules I and J, was receiv-

ing public assistance. She subsequently obtained part-time employment.

maintained that Ms. Joyce believed that she needed to reaffirm the debt in excess of the value of the stove in order to assure a line of credit to purchase items for her children.

### 8. Donald and Nancy Wayland

Mr. Wayland testified that he signed the reaffirmation agreement when a Sears representative approached him at his § 341 meeting and asked him whether he would like to return the goods he bought from Sears or whether he would like to pay $13 a month. He said that he decided to sign the agreement because he didn't want to cheat anyone out of what he truly owed them. *See* March 5, 1998 Hrg.Tr. at 9.[15]

Mr. Wayland further testified that his attorney asked whether he would be able to pay Sears and he responded affirmatively. *Id.* at 10. Mr. Wayland could not remember being informed that he could rescind the agreement, whether redemption was an option, whether the debt to Sears was dischargeable, whether the values Sears placed on the collateral were accurate, whether Sears had a valid security interest, what Sears could do if he did not pay the reaffirmed amount, how long it would take to pay Sears if he made only the minimum monthly payments, or whether Sears would likely have reclaimed the goods in the absence of a reaffirmation agreement.

The Waylands' counsel verified that he had not discussed the foregoing information with his clients. He testified that he signed the § 524(c)(3) declaration because Mr. Wayland stated that he could afford to pay the reaffirmed debt and because the Waylands' combined gross income was over $60,000. Counsel also maintained that Mr. Wayland informed him of his intention to pay back the reaffirmed debt to Sears in one lump sum. Therefore, the applicable interest rate of the reaffirmed

debt and the amount of payments did not seem to be relevant.[16] In addition, counsel explained that if he had known that Sears had no intention of reclaiming the goods he never would have advised the Debtors to sign the reaffirmation agreement.

### E. What constitutes Reasonable Inquiry under Rule 9011?

Sears asserts that Rule 9011 requires only that the attorney who signs a § 524(c)(3) declaration have any factual basis for the contention that reaffirmation of the debt will not cause an undue hardship upon the debtor or the debtor's dependents. The United States Trustee counters that Rule 9011 requires the attorney to make a reasonable inquiry based on a totality of the surrounding circumstances.

■■■■ Generally, under Rule 9011, an attorney may make a written allegation or factual contention (Fed.R.Bankr.P. 9011(b)(3)) or deny a factual contention (Fed.R.Bankr.P.9011(b)(4)) only with the benefit of evidentiary support. Nevertheless, where such support is not available, and the attorney specifically identifies the absence of such support, the attorney may make a factual contention if it is "likely to have evidentiary support after a reasonable opportunity for further investigation or discovery," or may deny a contention if "reasonably based on a lack of information or belief." *See Melendez I*, 224 B.R. at 259 n. 8 (citing Fed.R.Bankr.P. 9011(b)(3), (4)). However, those exceptions to the general rule "cannot be employed in a § 524(c)(3) declaration of attorney, because the statute requires attorneys to make the [ ] statements set forth in § 524(c)(3)(A) through (C) definitively." *Id.* Here, the challenged representations are that the respective debtors have been *fully informed* as to the legal consequences of their reaffirmation agreements, and that the reaffirmation of the referenced consumer debt will *not constitute an*

---

**15.** Mr. Wayland entered into at least one other reaffirmation agreement with a consumer lienholder, apparently reflecting a consistent disposition to avoid cheating creditors—but notably only with those who held his property as collateral.

**16.** But again, redemption was not discussed.

*undue hardship* for them or for their dependents. These conclusive statements can not be made merely by having some evidence as to their truth. This Court agrees with the United States Trustee. Only if an attorney undertakes an appropriate investigation and considers the totality of the surrounding circumstances will the attorney have complied with Rule 9011 in making the § 524(c)(3) declaration.

Of course, the nature and extent of what is an appropriate § 524(c)(3) investigation is a more complex matter, and that question has been the subject of considerable reflection by other courts. In *In re Bruzzese*, 214 B.R. 444 (Bankr.E.D.N.Y.1997), the court, *sua sponte*, reopened a debtor's case to review a reaffirmation agreement, and ultimately held that, although debtor's

counsel had facially complied with § 524(c)(3), counsel had "violated the provisions of Federal Rule of Bankruptcy Procedure 9011 by failing to investigate and explain the relevant facts in this case to the debtor." *Bruzzese*, 214 B.R. at 451. Judge Bernstein concluded that debtors needed to obtain more information about reaffirmations and then set forth what he termed an "interim administrative order or Chambers Rule" requiring certain disclosures in connection with future reaffirmation agreements to be filed with the court (whether or not the debtor was represented by an attorney).[17] *Id.* Judge Bernstein believed that requiring such additional disclosures would set the proper standard for attorney conduct when negotiating reaffirmation agreements for clients. *See also*

---

**17.** According to Judge Bernstein, the following disclosures were required before a reaffirmation agreement could be approved:

A. Unsecured Agreements

For any reaffirmation agreement of any prepetition debt or extension or addition of new credit arising under an unsecured revolving retail credit account:

1. The creditor shall attach to the reaffirmation agreement or submit to the debtor and to the debtor's counsel in connection with this agreement, an easily legible copy of the underlying credit agreement in at least "10 point type";

2. A full and detailed disclosure statement with respect to:

(a) The amount of the prepetition claim;

(b) The principal amount of the reaffirmed amount;

(c) The minimum monthly payment of the reaffirmed amount;

(d) The actual annual percentage rate of interest and all other types of finance charges and their manner of calculation, including but not limited to any late fees, any over-the-limit fees, any annual or periodic service fee, any optional or mandatory credit insurance premiums, or any other items required, assuming that Regulation Z were to apply to this transaction and treat it as a "refinancing;"

(e) A full and easily legible amortization schedule of payments so that debtor can understand the number of months that it will take to satisfy the reaffirmed indebtedness, and the amount of credit that would become available under the reopened credit line as the principal balance of that reaf-

firmed indebtedness was reduced on a monthly basis; and

(f) Separately, as to the extension of new or additional credit, the information required under (d) above for the reaffirmed amount, plus the monthly minimum payment if any of that credit is used; and

4. If the reaffirmation agreement is jointly executed by the parties before the expiration of the deadline for filing complaints under section 523 and to the extent that any part of the "consideration" of "inducement" for the debtor's entering into the reaffirmation agreement is to settle a threatened or potential nondischargeability complaint under section 523(a)(2)(A) or (C), then a detailed summary of the alleged specific transactions and amount that the creditor would seek to except from discharge, and of the alleged legal grounds supporting any potential complaint, as well as a statement describing the right of the debtor to recover costs and reasonable attorney's fees under the limiting conditions of section 523(d); and/or

B. Secured Agreements

For any reaffirmation agreement of any purchase money security interest in consumer goods, to the extent allowed by applicable New York state law, the following disclosures shall have to be made:

1. A easily legible summary of the applicable provisions under the New York Retail Sales Instalment Act;

2. Each of the items set forth under A(1) through (2)(g) above;

3. With respect to each item of merchandise in which the creditor claims a purchase money security interest enforceable as a matter of state law:

*In re Kamps,* 217 B.R. 836 (Bankr. C.D.Cal.1998) (numerous disclosures should be required before a reaffirmation agreement can be approved by the court).[18]

■ This Court finds the views expressed in *Bruzzese* and *Kamps* persuasive.[19] The requirements of Rule 9011 cannot be met, or even properly addressed, absent the disclosure of critical facts relating to the debt sought to be reaffirmed, the nature and value of any

> (a) A description of each item sufficient to satisfy the requirements of specificity under Article 9 of the Uniform Commercial Code as adopted by and in effect, as amended, by the State of New York;
> (b) The date of purchase of each item;
> (c) The invoice amount to the debtor of each item as of the date of purchase, excluding any charges for service contracts or extended warranties;
> (d) The outstanding balance as of the petition for each item;
> (e) The estimated retail replacement value of each item as of the petition date, assuming normal wear and tear and customary usage of these items by the debtor, and whatever other adjustments may be required under the circumstances in light of the criteria set forth in the opinion of the U.S. Supreme Court in *Associates Commercial Corp. v. Rash,* —— U.S. ——, 117 S.Ct. 1879, 138 L.Ed.2d 148 (1997), and the basis that the creditor relied upon in making this valuation, including copied of the pages of any relevant industry or intra-company guides;
> (f) A summary of the remedies available for enforcement of this agreement under applicable state law; and
> (g) A statement of the options available to the debtor as a matter of law under the Bankruptcy Code with respect to one or more items of collateral in either (i) surrendering or abandoning, (ii) redeeming, (iii) retaining and continuing to pay the appropriate indebtedness on a current basis consistent with the opinion of the Second Circuit in *In re Boodrow,* 126 F.3d 43 (2d Cir.1997), or (iv) reaffirming the indebtedness subject to the conditions of section 524.

*Bruzzese,* 214 B.R. at 452–53.

18. The *Kamps* court broke down the relevant types of disclosures required to be made to the debtor into several types, including (1) disclosures supporting the validity of the creditor's proposed security interest; (2) disclosures relating to the details of the consumer underlying collateral and the financial circumstances of the debtor. The development of those critical facts requires investigation into and answers for at least the following questions:

***1. Would reaffirmation of the debt cause the debtor(s) and/or his/her/ their dependents undue hardship— § 524(c)(2)(B)?***

■ In *Melendez I,* this Court opined that reaffirmation of an obligation credit transaction comprising the reaffirmation; (3) disclosures relating to §§ 521 and 524 options; and (4) disclosures relating to the reaffirming creditor's replevin decision if the debt were not reaffirmed. *Kamps,* 217 B.R. at 847–56.

19. This Court also finds the National Bankruptcy Review Commission's (the "Commission") recommendations on reaffirmations particularly instructive. The Commission advises, in relevant part, the following:

> 11 U.S.C. § 524(c) should be amended to provide that a reaffirmation agreement is permitted, with court approval, only if the amount of the debt that the debtor seeks to reaffirm does not exceed the allowed secured claim, the lien is not avoidable under the provisions of title 11, no attorney fees, costs, or expenses have been added to the principal amount of the debt to be reaffirmed, the motion for approval of the agreement is accompanied security by underlying contractual documents and all related security agreements or liens, together with evidence of their perfection, the debtor has provided all information requested in the motion for approval of the agreement, and the agreement conforms with all other requirements of subsection (c).

Nat'l Bankr.Rev. Comm'n, Final Report § 1.3.1 (1997). Essentially, the Commission has suggested that section 524 be amended to require additional disclosures regarding the collateral, the debt and the basis of their valuation. This Court agrees with the recommendations of the Commission, but also finds that the disclosures being sought by the Commission can be adopted by case law interpreting the requirements of § 524(c)(3). *See Kamps,* 217 B.R. at 855–56 ("The court finds that an amendment to section 524(c) is not necessary to accomplish this recommendation. It can be adopted by case law interpreting the 'best interest of the debtor' standard already contained in section 524(c).")

would cause a debtor "undue hardship" where reaffirmation "would result in a significant, but otherwise avoidable, obstacle to the attainment or retention of necessaries by the debtor or the debtor's dependents." 224 B.R. at 261. In order to be satisfied that reaffirmation would not cause a debtor undue hardship, an attorney must be fully conversant with the financial circumstances of both the debtor and the debtor's dependents. An attorney should analyze the income and expenses of the debtor's household, including a review and update of the information contained in the debtor's Schedules I and J. If it appears that the debtor's expenses will exceed his or her postpetition income, and if reaffirmation of the debt is not necessary to retain an item which the debtor or his or her dependents require for their well-being—or if the item itself is not necessary—then payment of the reaffirmed debt in addition to the debtor's existing expenses would clearly jeopardize the debtor's ability to pay for necessary living expenses and impose an undue hardship on the debtor or his or her dependents.

### 2. Has the debtor been fully informed— § 524(c)(3)(A)?

#### a. Security Interest Disclosures

■ In order to properly advise the debtor about whether to enter into a reaffirmation agreement, debtor's counsel must review any contract granting the creditor a security interest in any collateral and verify that the creditor indeed has a valid security interest. In other words, if debtor's counsel cannot verify that the debt is owed, there is no basis for the reaffirmation of the debt.

■ Counsel for the debtor must have possession of a copy of the underlying security agreement and charge slips (if applicable) and any related documents. *See Kamps,* 217 B.R. at 851; *see also Boudrow v. Sears, Roebuck & Co. (In re Boudrow),* 1995 WL 96958 (D.Mass. Feb. 8, 1995) (finding that a sales slip signed by the debtor satisfied the requirements of Mass.Gen.Laws Ann. 106, § 9–203 (West 1988) and thus created a valid security interest); *Matter of Wiegert,* 145 B.R. 621, 622 (Bankr.D.Neb.1991) (sales slip contains essential terms of a security agreement); *In re Hardage,* 99 B.R. 738, 742 (Bankr.N.D.Tex.1989) (same). Debtor's counsel must inquire as to whether, and be satisfied that, the debtor is still in possession of the goods subject to the security interest.

■ Debtor's counsel must also be satisfied as to the extent of the security interest. First, counsel should verify the amount of the claim by both reviewing the history of the payments that the debtor made on the original debt, and any subsequent charges that the debtor has made under the revolving credit account. *Kamps,* 217 B.R. at 854. Second, counsel must become reasonably conversant with the replacement value of any collateral, particularly if age, obsolescence or other factors might render such value de minimus. *See Mayton v. Sears, Roebuck & Co. (In re Mayton),* 208 B.R. 61, 66 (9th Cir. BAP 1997) (finding that the property subject to a reaffirmation agreement is almost always well worn and not infrequently is the stuff of which garage sales are made). The secured creditor's valuation of its own collateral, as was so clearly demonstrated during these evidentiary hearing, is not an appropriate source for reliance. Where a creditor's valuation of its collateral ignores the condition of the goods, variations in the original purchase price, the geographical area and current market demand for the item, that valuation deserves to be ignored. Actually, it must be ignored. It is patently unreasonable for an attorney to accept a creditor's asserted values for collateral without an independent investigation. Proper investigation should include, at the very least, verification of the date of the purchase of the goods (to determine their age) and the original purchase price of the goods (excluding such charges as sales tax, service contracts and extended

warranties); consideration of the condition of the goods, the geographical area in which the goods might be sold, current market demand for the goods and the costs to the creditor on resale; and the application of good common sense. True market value "must be a realistic sales price in a viable market where the goods can reasonably be sold: usually [for goods subject to reaffirmation agreements] this will be [a] garage sale or newspaper classified advertising market." *Kamps*, 217 B.R. at 853.

### b. Financial Disclosures

■ Debtor's counsel must also be familiar with and communicate to the debtor, in terms familiar to lay persons, the financial terms of the reaffirmation agreement. As guidance, debtor's counsel should consider the disclosures mandated by the Federal Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 and the Massachusetts Consumer Credit Cost Disclosure Act ("CCCDA"), Mass.Gen.Laws.Ann. ch. 140D, both of which seek to guarantee the accurate and meaningful disclosure of costs of consumer credit in order to enable the consumer to make an informed choice in the credit marketplace. *Desrosiers v. Transamerica Fin. Corp. (In re Desrosiers)*, 212 B.R. 716, 722 (Bankr.D.Mass. 1997). To fulfill this statutory mandate, the Federal Reserve Board has promulgated Regulation Z, 12 C.F.R. § 226, detailing the disclosures that a lender must make in a consumer credit transaction. Both

TILA and CCCDA are "remedial statutes designed to protect consumers, who are not on equal footing with creditors, either in bargaining for credit terms or in knowledge of credit provisions." Kathleen E. Keest, *Recent Developments in Residential Mortgage Litigation: TIL Recission as a Defense to Foreclosure*, 989 PLI/Corp 507, 531 (April, 1997); *see also Bizier v. Globe Fin. Servs., Inc.*, 654 F.2d 1, 3 (1st Cir.1981); *Mechanics Nat'l Bank of Worcester v. Killeen*, 377 Mass. 100, 384 N.E.2d 1231 (1979).[20]

■ Disclosures under TILA and CCCDA which are important in the context of reaffirmation agreements include the annual percentage rate[21], a statement on when payments are due, the applicable grace period, the method for determining finance charges, and late payments or over-the-limit charges. In addition, debtor's counsel should verify with the creditor and disclose to the debtor the amount of the prepetition claim; the principal amount of the reaffirmed debt; the minimum monthly payment on the reaffirmed amount; and the amount, if any, of an extension or renewal of the debtor's credit line.

■ To ensure that the debtor fully understands his or her obligations, debtor's counsel should insist that the creditor provide the debtor with the foregoing financial disclosures in writing and also provide the debtor with "a full and easily legible amortization schedule of the pay-

---

**20.** At this time, the Court declines to decide whether TILA and CCCDA are applicable to reaffirmation agreements under the Bankruptcy Code. Regulation Z exempts all court approved reaffirmation agreements from the scope of its coverage. 12 C.F.R. § 226.9(c)(2), § 226.20(a)(3). However, it is not clear that reaffirmation agreements are court approved agreements within the meaning of Regulation Z, particularly where filed without court action under § 524(c). *See Bruzzese*, 214 B.R. at 459; *Kamps*, 217 B.R. at 850.

**21.** For example, Sears charges an interest of 21% on reaffirmation agreements. That rate

is in excess of the amount which would constitute usury in Massachusetts, *see* Mass.Gen. Laws Ann. ch. 271, § 49 (West 1990), unless Sears first registered with the Commonwealth of Massachusetts Attorney General or unless Sears enjoyed an exemption. Sears claims to enjoy an exemption because its credit card is issued by the Sears National Bank.

It is also unclear whether Sears calculates interest on the original principal or on the total reaffirmed amount. If the latter is true, the total interest rate may be much higher since it may consist, in part, of interest upon interest.

ments ... [which sets out] the number of months that it will take to satisfy the reaffirmed indebtedness." *Bruzzese*, 214 B.R. at 452. Debtors who seek to reaffirm a prepetition debt in exchange for a reinstatement of their credit line and/or an additional line of credit should also be given information about the amount of credit that will become available under the reopened credit line as the principal balance of that reaffirmed indebtedness is reduced, the amount of time it will take for the principal of the debt to be meaningfully reduced before the debtor can use the credit line[22], and the monthly minimum payment if that credit is used.

c. Replevy

 The debtor also "needs to know whether a creditor claiming to be secured has in fact decided to pursue repossession of the collateral if the debt is not reaffirmed[.]" *Kamps*, 217 B.R. at 854. Early on, Congress recognized, that:

[m]ost often in a consumer case, a secured creditor has a security interest in property that is virtually worthless to anyone but the debtor. The creditor obtains a security interest in ... the debtor's furniture, clothes, cooking utensils, and other personal effects. These items have little or no resale value. They do, however, have a high replacement cost. The mere threat of repossession operates as pressure on the debtor to pay the secured creditor more than he would receive were he actually to repossess and sell the goods.

H.R.Rep. No. 595, 95th Cong., 1st Sess. at 124 (1977) reprinted in 1978 U.S.C.C.A.N.

5963. The creditor thus asserts leverage for reaffirmation even where the property has little or no resale value and possibly no real intention to repossess the goods held by the debtor. One court aptly noted in another case involving Sears that "[t]he costs of repossessing, refurbishing, and reselling many household goods would not be worth Sears' time and effort, and the threat of repossession therefore is probably an empty one in many circumstances." *In re White*, 231 B.R. 551, 555 n. 12 (Bankr.D.Vt.1999). It makes no sense for a debtor to enter into a reaffirmation agreement to save an item whose loss is not at risk. Debtor's counsel has an obligation not to execute the § 524(c)(3) declaration in such circumstances if the debtor and/or the debtor's dependents can not tolerate the cost of the reaffirmed debt.

 In order to determine whether there is a real risk of replevin absent the debtor's execution of the reaffirmation agreement, debtor's counsel must "perform a risk assessment with the client by analyzing the risk of replevy, in light of the age, condition and value of the goods versus the need of and cost to the debtor to retain the items at risk. In order to perform such assessment, counsel for the debtor must be familiar with Sears published policies regarding replevin, in particular the various discretionary factors Sears' will take into account in its decision to replevy, and should apply them to the circumstances of the debtor's case." *See* United States Trustee Mem. of Law at 33.

d. Avoidance of Security Interest

 Debtor's counsel must be certain that the purported security interest is

---

**22.** In *Melendez I,* this Court expressed its concern that in such a situation, a debtor may not recognize that "the interest rate on the reaffirmed debt (Sears charges 21% per annum), combined with the small minimum payment (which the debtor would already have to struggle to make), ma[kes] it considerably unlikely that the principal of the reaffirmed debt could be meaningfully reduced for a substantial period of time [which in turn meant that] the reinstatement of the credit line would be of illusory benefit." 224 B.R. at 265; *see*

*Bruzzese,* 214 B.R. at 449 (debtor was not told that satisfying the reaffirmed debt of $1,800 on the terms offered by Sears, if paid at the rate stated in the reaffirmation, would take 76 months and cost her almost $1,500 in interest); *In re Hopkins,* 1997 WL 803718 at *1 (Bankr.W.D.Mich. Dec. 24, 1997) (reaffirmation of a particular debt before the court on terms proposed by Sears would result in negative amortization, causing the debt to actually increase over time notwithstanding no payment default).

not avoidable under 11 U.S.C § 522(f). If the debtor's interest in reaffirming the debt is retention of collateral, reaffirmation is not reasonable if the security interest could be easily avoided.

### 3. Was execution of the reaffirmation agreement voluntary— § 524(c)(3)(A)?

■ Prior to signing the 524(c)(3) attorney declaration counsel must ensure that the agreement was entered into voluntarily and without creditor coercion or threats of any nature.

### 4. Does the debtor understand the legal effects of the agreement and the consequences of default— § 524(c)(3)(C)?

a. Reaffirmation Agreement

■ Counsel for the debtor must also ensure that the debtor fully understands the agreement, the debtor's responsibilities thereunder, the consequences of any default and the right to rescind the agreement within the specified time period.

b. Other Bankruptcy Related Disclosures

■ The debtor must also be informed as to the options available to the debtor as a matter of law under the Bankruptcy Code with respect to the collateral, including redemption. See Kamps, 217 B.R. at 854 (citing Bruzzese, 214 B.R. at 453). "The debtor needs to be informed of these alternatives, so that the debtor can make an intelligent, voluntary choice among them." Kamps, 217 B.R. at 854.

■ In addition, counsel should advise the debtor about alternative sources of credit. A debtor who seeks to reaffirm a prepetition debt in order to obtain an additional line of credit should understand that better credit terms, even with a higher percentage rate, after bankruptcy, may be more advantageous. For example, a debtor who reaffirms $1,500 of debt to receive a credit line of $2,000 (including the $1,500

of pre-bankruptcy debt) at 15% is actually worse off economically than if that debtor discharged the $1,500 of past debt and borrowed $500 of new credit at 22% interest. See Nat'l Bankr.Rev. Comm'n, Final Report § 1.3.1 (1997); see also Kamps, 217 B.R. at 855 (noting that there are a number of credit card issuers operating in the consumer finance market charging a fair percentage rate, even to persons who have received a recent discharge in bankruptcy).

## IV. Application

This Court now turns to the application of the foregoing concepts to the cases before it. Sears argues that, at this point in time, only three cases—Melendez, LaFleur and Wayland—are still subject to review under this Court's Rule 9011 orders. According to Sears, the reaffirmation agreements in the Callahan and Belisle cases are resolved because it is clear from their respective Schedules I and J that those debtors would be able to pay the reaffirmed debt to Sears out of their disposable income. As to the cases of Spencer, Crooks and Joyce, Sears states that this Court's orders are moot because those reaffirmation agreements have been rescinded, voided or withdrawn.

■ In Melendez I, this Court opined that "payment of reaffirmed debt cannot constitute an undue hardship where funds come from disposable income." Melendez I, 224 B.R. at 270 n. 23; see also 11 U.S.C. § 524(f). Since the filing of his reaffirmation agreement, Mr. Callahan has filed amended schedules showing that his income actually exceeded his expenses at the time of the filing of the reaffirmation agreement. Because Mr. Callahan had sufficient disposable income to meet both his household expenses and the financial obligation under his reaffirmation agreement with Sears, this Court is satisfied that Mr. Callahan would not have suffered any hardship as a result of paying the reaffirmed debt. However, not resolved is

whether Mr. Callahan was fully advised as to the legal effect and consequences of his reaffirmation agreement and any default thereunder, and more importantly, whether his attorney's declaration to that effect met the standards of Rule 9011. Similarly, although Mr. Belisle also eventually amended his schedules to reflect a new job that would permit him to make the payments under his reaffirmation agreement with Sears, that job was not available at the time of the execution of the reaffirmation agreement and, was, therefore, not an available source of evidentiary support for his attorney's § 524(c)(3) declaration.

■ With regard to thé cases of Ms. Spencer, Ms. Crooks and the Joyces, Sears argues that issues relating to those reaffirmation agreements are moot because the Spencer and Crooks agreements were rescinded on December 2, 1998 and January 8, 1999, respectively, and Ms. Joyce's reaffirmation agreement was voided by Sears on November 20, 1997.[23] Sears maintains that the debtors ... no longer have a stake in the outcome and ... therefore [the issues the Court has inquired about are now] moot. Sears' Mem. of Law at 14. Sears' reasoning is flawed. The issues now before the Court do not relate to the binding nature of the reaffirmation agreement; rather, they appertain to whether the attorneys who executed the respective § 524(c)(3) declarations violated Rule 9011. Those Rule 9011 issues, raised *sua sponte*, are not voidable or subject to waiver by any agreement by the debtor and the cred-

itor.[24] Therefore, the Rule 9011 issues in these cases are not moot.

■ Based on the materially undisputed testimony of the respective Debtors and their counsel, this Court finds and rules that:

1. Counsel for each of the Debtors, other than Mr. Callahan and the Joyces, failed to make a reasonable inquiry based on the totality of the surrounding circumstances before declaring to the Court that payment of the proposed reaffirmed amount would not cause undue hardship to the respective Debtors or their dependents. Those attorneys violated Rule 9011 when they made that assertion without properly considering the patent inability of their clients to make the payments without sacrificing necessities, when combined with the failure of those attorneys to properly investigate the value of the Sears collateral and/or the likelihood that Sears would act to replevy the items.

2. Counsel for each of the Debtors, other than the Joyces, failed to fully advise their respective clients with respect to most of the material issues relating to the legal effect of the respective reaffirmation agreements or a default thereunder. Therefore, in declaring otherwise in their § 524(c)(3) declaration, they violated Rule 9011 and misled the Court.

■ Only counsel for the Joyces appears to have understood her obligations

**23.** According to Sears, the reaffirmation agreement with Ms. Joyce was voided after Sears realized that the agreement was not filed with the Court until after the Debtor's discharge. Whether that action was required is not before the Court.

**24.** Rule 9011 does provide a safe harbor for an attorney who runs afoul of Rule 9011, by allowing the attorney to withdraw the offending pleading within a limited time frame after such violation has been called to the attention of that attorney, however, this limitation does not apply in the case of court initiated orders. *See* Fed.R.Bankr.P. 9011(c)(1). *See Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 395, 110

S.Ct. 2447, 110 L.Ed.2d 359 (1990) (quoting *Szabo Food Serv., Inc. v. Canteen Corp.*, 823 F.2d 1073, 1077 (7th Cir.1987)) ("When there is no safe harbor, 'a violation of Rule 11 is complete when the paper is filed.'"); *see also Elliott v. Tilton*, 64 F.3d 213, 216 (5th Cir. 1995) (safe harbor provision of 11(c)(1)(A) applies only when motion for sanctions is filed, not when court acts *sua sponte*); *Rhein Medical, Inc. v. Koehler*, 889 F.Supp. 1511, 1517 (M.D.Fla.1995) (the "safe harbor" provisions of Rule 11 do not apply to show case hearings initiated by the court which describe the specific conduct that appears to violate the rule).

to her clients and to the Court. Although not perfect, her inquiry into the ability of her clients to make the payment of the reaffirmed debt, the value of the collateral, the likelihood of its repossession, and the validity of the Sears security interest—and her advice to her clients as to their legal rights and obligations—met the minimum necessary for her to appropriately execute the § 524(c)(3) declaration.

 As to the § 524(c)(3) declarations made by the remaining attorneys for the Debtors, they must be struck. The declarations are incorrect as to their factual content, and were not made in accordance with the declarants' obligations under Rule 9011. Correspondingly, in the absence of the declarations, the reaffirmation agreements must be annulled to the extent not already voided, rescinded or withdrawn.[25] Here, as was the case in *Bruzzese:* "(i) it was not in the interest of the debtor to enter into it under the totality of the circumstances of this case, (ii) the debtor was not fully informed about the true economic consequences of the agreement, and (iii) it imposed an undue hardship upon the debtor due to [the debtor's] severely negative monthly cash flow." 214 B.R. at 451; *see also Hovestadt,* 193 B.R. at 387 (counsel's declaration on the face of the reaffirmation agreement must be struck because it violates the attorney's duties under Rule 9011).

 What remains is the question of what additional sanctions, if any, ought to be imposed on the attorneys whose § 524(c)(3) declarations have been struck. Courts have recognized that *sua sponte* sanctions by the court for Rule 11 violations should be imposed only when they are analogous to a "contempt of court." *See Barber v. Miller,* 146 F.3d 707, 711 (9th Cir.1998); *Wesely v. Churchill Dev. Corp.,* 99 F.3d 1141 (6th Cir.1996); *Hadges*

*v. Yonkers Racing Corp.,* 48 F.3d 1320, 1329 (2d Cir.1995); *see also* Advisory Committee Note to Fed.R.Civ.P. 11 (show cause orders will ordinarily be issued only in situations that are akin to a contempt of court) (1993 Amendments). This Court agrees and believes that the imposition of monetary sanctions against the attorneys whose declarations have been struck in these cases is inappropriate, particularly because the *specific* obligations of debtors' counsel in the execution of § 524(c)(3) declarations has, in some respects, been unsettled to date. Accordingly, although counsel's actions were far from exemplary, they do not rise to a level which would justify the imposition of monetary sanctions. Furthermore, as this Court stated in *Melendez I:*

> It has been this Court's experience that, in most cases, § 524(c)(3) attorney declarations ... reflect a contradiction in role that is, in this Court's view unique in the law. After giving appropriate advice to the debtor, the debtor's counsel is expected by § 524(c)(3) to take his or her client's instruction as to reaffirmation and then effectively decide whether to assent to or veto that decision. This Court cannot recall another scenario in which an attorney, an advocate, is so blatantly asked to "judge" his or her clients' actions. And so, while the application of Rule 9011 standards is necessary, the Court should not so blind itself as to the difficult circumstances surrounding the decision-making of the debtor's counsel.

224 B.R. at 278. As a result, no monetary sanctions will be imposed upon the affected counsel.[26]

## V. *Conclusion*

Where a debtor is represented by counsel and chooses to enter into a reaffirmation agreement, the validity of that agree-

---

25. Sears has already represented, in open court, not to replevy any of the subject collateral.

26. Of course, in appropriate cases in the future, the Court may impose monetary sanctions upon debtors' attorneys whose § 524(c)(3) declarations suffer from a gross failure to comply with Rule 9011.

ment is dependent on the execution by debtor's counsel of the declaration required by § 524(c)(3). That declaration is, in turn, subject to an attorney's obligations under Rule 9011.

■ In order to comply with Rule 9011, the attorney must both conduct a reasonable inquiry to ensure that the totality of the attending circumstances support the factual allegations set forth in the § 524(c)(3) declaration and ensure that the information provided to the debtor is sufficient to comport with the representation of attorney disclosure. At a minimum, debtor's counsel must:

(1) review the debtor's financial circumstances to determine whether the debtor has the ability to pay the reaffirmed debt without sacrificing necessities for the debtor or the debtor's dependents;

(2) review the security agreement, charge slips, payment history and other documentation constituting the security interest claimed by the creditor in order to verify the amount of the creditor's claim, the validity, extent and perfection of the alleged security interest and the non-avoidability of the alleged lien under the Bankruptcy Code;

(3) question the value placed on the goods by the secured creditor and independently estimate that value;

(4) evaluate the risk of replevy by the creditor, in light of the age, condition and value of the goods versus the need of and cost to the debtor to retain the items at risk; and demand a replevy decision from the secured creditor prior to execution of the reaffirmation agreement;

(5) discuss relevant financial disclosures with the debtor;

(6) ensure that the agreement was entered into voluntarily and without creditor misrepresentations or coercion;

(7) ensure that the debtor understands the effect and consequences of the agreement and the consequences of default;

(8) ensure that the debtor is informed as to his or her options with respect to the collateral under the Bankruptcy Code; and

(9) advise the debtor as to alternative sources of credit.

This list is by no means comprehensive.[27] Nor is all of this information necessarily at the disposal of the debtor's attorney. Some of this information is exclusively within the control of the creditor. But where a creditor refuses to provide that information, the debtor's attorney has no option. The attorney must decline to execute the § 524(c)(3) declaration. Accordingly, the creditor who stonewalls or undermines an appropriate inquiry by debtor's counsel will lose the opportunity to have its debt reaffirmed.

■ In the cases now before the Court, all but one of the attorneys failed to meet their Rule 9011 obligations in executing their § 524(c)(3) declarations in the reaffirmation agreements between their clients and Sears. Granted, their job was not easy. In most cases, their clients required the items under consideration to meet their basic needs or the needs of their families. And Sears, fresh from its concession of wrongdoing as described in *Latanowich,* continues to further its single-minded approach to have its debts reaffirmed—by impliedly threatening at § 341 meetings to replevy its collateral of consumer goods regardless of its true intentions to do so (as reflected in its new replevin policies); by undermining its

---

**27.** This Court applauds Reaffirmation Agreement Form B 240 recently developed by the Advisory Committee on Bankruptcy Rules and issued by the Administrative Office of the United States Courts on June 17, 1999. This form clearly encompasses many of the concerns set forth above. It should be noted, however, that utilization of this form in no way limits debtor's counsel obligations under Rule 9011 to conduct a thorough investigation and make a full disclosure to the debtor before executing the § 524(c)(3) attorney declaration.

agreement with the Massachusetts Attorney General; by promoting valuations of those consumer goods notwithstanding the embarrassingly shoddy method by which the valuations were produced; and by offering lines of additional credit to debtors desperate for the facility to meet their needs and the needs of their families, but objectively and obviously unable to repay either the reaffirmed amount or the additional advance of credit. Nevertheless, Congress has assumed that an attorney's declaration under § 524(c)(3) will be accurate, notwithstanding creditor pressure. Those attorneys who declare in writing that they have fulfilled their § 524(c)(3) obligations must be prepared, as required by Rule 9011, to justify that assertion.

The attorney declarations in each of the reaffirmation agreements under review, other than the agreement in the Joyce case, will be struck as made in violation of Rule 9011. Accordingly, the agreements themselves will be annulled, if not already rescinded, voided or withdrawn by the parties.